**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| THE ESTATE OF SHALI TILSON, | ) | |
| TYNESHA RENEE TILSON and | ) | |
| VLADIMIR JOSEPH, the parents of | ) | |
| Shali Tilson, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| SHERIFF ERIC J. LEVETT, in his | ) | |
| official and individual capacities, | ) | |
| ROCKDALE COUNTY, GEORGIA, | ) | |
| SERGEANT DAN LANG, individually, | ) | |
| DEPUTY TOLBERT, individually, | ) | |
| DEPUTY SHIRED, individually, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**COMPLAINT FOR DAMAGES**</u>

Shali Tilson died of dehydration while locked in solitary confinement. This lawsuit is filed on behalf of Shali Tilson's estate and his parents, Tynesha Tilson and Vladimir Joseph under 42 U.S.C. § 1983, the Americans with Disabilities Act, the Rehabilitation Act, and Georgia law.

1

## SUMMARY OF THE ALLEGATIONS

Jails are not psychiatric hospitals. And people suffering from psychosis should not be held in solitary confinement. But when Shali Tilson was arrested for misdemeanor disorderly conduct, and it was obvious that he was in the midst of a psychiatric crisis, that is exactly what happened.

After Mr. Tilson's misdemeanor arrest, each person who interacted with Mr. Tilson could tell that he was not well. Mr. Tilson's behavior was erratic, and it was clear that he was experiencing delusions, hallucinations, and paranoia. In spite of clear and obvious signs that Mr. Tilson was in the midst of a medical crisis, the jailers did not seek medical attention for him. Instead, they placed him, unmedicated, in solitary confinement. For eight days, Mr. Tilson remained locked in a single cell with no running water, and only a "suicide gown,"[1] a metal bed, and a hole in the floor to urinate and defecate.[2] Mr. Tilson remained there in spite of the fact that all jail personnel who interacted with him knew that Mr. Tilson was in

---

[1] Mr. Tilson actually spent the majority of his time in his cell completely naked.

[2] Mr. Tilson's cell was equipped with an emergency call button, but it did not work. The deputies at the jail knew it did not work.

a state of continued crisis and required immediate medical attention. During his time in the jail, Mr. Tilson was the subject of seven separate uses of force. Each incident stemmed from a clear manifestation of his psychosis, and largely consisted of Mr. Tilson feebly attempting to avoid being placed back in his cell before being easily overpowered.[3]

Mr. Tilson's treatment does not reflect well upon our society, and it gets much worse. Six days after being placed in solitary confinement, with no outside contact,[4] no psychiatric assessment, and no medication, Mr. Tilson died of a pulmonary embolism caused by dehydration.[5] For a person to be dehydrated to Mr. Tilson's state, they would have to be without water for at least two days.

_____

[3] The effects of solitary confinement on people with mental illness are difficult to understate. *See, e.g.*, *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price. *See, e.g.*, Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U.J.L. & Pol'y 325 (2006) (common side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors)."); *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J. dissenting; joined by Ginsburg, J.) ("[I]t is well documented that such prolonged solitary confinement produces numerous deleterious harms.").

[4] The jail staff refused to allow members of Mr. Tilson's family to see him just three days before his death, because he was "in solitary."

[5] Mr. Tilson's state of dehydration caused a pulmonary embolism. In other words, his blood became so viscous from the lack of water that it formed clots, and those clots then traveled to his lungs and he suffocated to death.

Mr. Tilson's inexcusable death is the product of multiple levels of individual and systemic failure. During Tilson's time in solitary confinement, deputies neglected their duties, falsified their watch logs, and ignored the obvious signs that Mr. Tilson was in a state of distress. On the day of his death, Mr. Tilson pressed the emergency call button in his cell. It did not work. When he lost consciousness due to dehydration, he sat naked, leaning against the wall, with his head slumped over for over three hours. He still could have been saved, but no one checked on him in spite of having a duty to perform safety checks every fifteen minutes.

This case poses the following questions: Why was someone in a state of psychosis held naked in solitary confinement for days with no medical treatment? How can someone in jail on "suicide watch" possibly die of dehydration? Why did it take jail staff over three hours to realize that Mr. Tilson was dead, in spite of an obligation to check on him every fifteen minutes?

The jail's response to this death has not helped to answer these questions. After Mr. Tilson's death and before any investigation occurred, surveillance videos that would have shown exactly what happened to Mr. Tilson over the last three days of his life are inexplicably missing.

4

## PARTIES

1. Plaintiff Tynesha Renee Tilson is the mother of Shali Tilson. Ms. Tilson is a resident of the State of Georgia and over the age of eighteen.

2. Plaintiff Vladimir Joseph is the father of Shali Tilson. Mr. Tilson is a resident of the State of Georgia and over the age of eighteen.

3. The Estate of Shali Tilson was established by order of the Probate Court of Rockdale County. The Estate sues to recover damages for pain and suffering which occurred prior to the death of Mr. Tilson.

4. Tynesha Tilson and Vladimir Joseph hold the right to pursue the claims arising from their son's death. Shali Tilson had never been married and did not have any children.

5. Defendant Sheriff Eric J. Levett is the elected sheriff of Rockdale County, and was the Sheriff at all times pertinent to this lawsuit.

6. Defendant Rockdale County is a County within the State of Georgia.

7. Defendants Lang, Tolbert, and Shired are three Sheriff's deputies employed by the Rockdale County Sheriff. These three deputies were

5

assigned to oversee Mr. Tilson on the evening of his death, and acted under the color of law.

8.  The following non-parties are the guards at the jail who were responsible for overseeing Shali Tilson for the three days of his life, during which time he was without sufficient water: Abrams, Anderson, Blue, Cassett, Cromartie, Davis, Garner, Hall, Jones, Robinson, Shired, Tate, Ward, and Williams ("the Guards").

9.  Non-parties Bishop, Bogardts, Guillebeau, Klein, Lang, Lynn, and Patterson ("the Watch Commanders") are each supervising officers within the Sheriff's office. During the time from March 9th to March 12th, each of these Defendants acted as a watch commander charged with overseeing the actions of the preceding non-parties. During that period and at all relevant times, each and all of these Defendants were acting in their official capacities as employees of the Sheriff's office and acting under the color of law.

10. Non-party Correct Care Solutions, LLC ("CCS") is a private for-profit limited liability company based in Tennessee. CCS contracts with the

6

County to provide medical services to people who are incarcerated in the Rockdale County jail.

## JURISDICTION AND VENUE

11.   This action arises under the authority vested in this Court by virtue of 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) .

12.   This Court has supplemental jurisdiction of Plaintiffs' state law claims under 28 U.S.C. § 1367.

13.   Upon service of process, this Court acquires personal jurisdiction of Defendants under Fed. R. Civ. P. 4(k)(1)(a).

14.   Venue is proper in the Atlanta Division of the Northern District of Georgia under 28 U.S.C. § 1391(b) because all actions complained of occurred within the boundaries of this district and Defendants reside within this district.

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

*Shali Tilson's Arrest for Disorderly Conduct*

15.   On the morning of March 3, 2018, police officers employed by the City of Conyers arrested Shali Tilson who was then twenty-two years old.

16.   When Mr. Tilson was arrested, it was obvious and apparent that he was in the midst of a mental health crisis.

17.   For example, prior to and during his arrest, Mr. Tilson yelled words and phrases that revealed that his mental state was completely detached from reality. The things Mr. Tilson said and did bore no relation to what was occurring around him.

18.   Mr. Tilson was charged with misdemeanor disorderly conduct and misdemeanor obstruction of justice.

19.   After arresting Mr. Tilson, police officers employed by the City of Conyers transported him to the Rockdale County Jail.

8

*Tilson's arrival at the jail*

20.    Upon his arrival at the jail, Mr. Tilson remained in an obvious state of extreme mental distress.

21.    The following officers were involved in receiving and booking Tilson: Sgt. Guillebeau, Cpl. Tatum, Deputy Lightford, and Deputy Kilgore.

22.    Upon the arrival of City of Conyers police officers at the jail, officers with the City informed Sgt. Guillebeau that the City of Conyers police officers did not know Mr. Tilson's name, and that Mr. Tilson was acting erratically and that the words Mr. Tilson was saying did not make sense.

23.    Sgt. Guillebeau then made contact with Mr. Tilson, and Sgt. Guillebeau also observed that Mr. Tilson was in an extreme mental health crisis because Mr. Tilson simply began screaming "n*****" and making other nonsensical statements.

24.    Mr. Tilson refused to exit the back of the police car and physically resisted Sgt. Guillebeau's attempts to remove him.

25.    Sgt. Guillebeau then told Deputy Lightford to retrieve a four-point restraint chair. After Lightford arrived with the chair, Sgt. Guillebeau and Cpl. Tatum removed Tilson from the backseat and placed him in the restraint chair and secured all restraints. During the process of restraining Tilson, Deputy Lightford punched him. The deputies then transported Mr. Tilson into the booking area to cell 11.

*Transfer to Solitary Confinement*

26.    On March 4, 2018, Tilson was the subject of four separate uses of force.

27.    Each use of force was preceded by Mr. Tilson acting in an erratic and unpredictable—but not violent—manner. For example, Mr. Tilson would attempt to exit his cell, or he would feebly attempt to escape while being transported.

28.    On March 4, 2018—after numerous observed incidents involving Tilson's erratic behavior—a nurse named Eugene Andry employed by Correct Care Solutions, LLC approved transferring Mr. Tilson to solitary confinement.

29.    The following corrections officers and medical contractors observed

clear and obvious signs of Tilson's medical crisis by that time: Bell,

Bishop, Bogardts, Cromartie, Duke, Guillebeau, Kilgore, Lightford,

Lang, Laudermilk, Lyons, Lynn, Patterson, Price, Smith, Spear,

Tatum, Ward, Wilson, and Williams.

30.    When Mr. Tilson arrived at his new cell, he was speaking loudly, wild

eyed, and shaking. Mr. Tilson stated "I got these bumps all over my

skin," and made repeated requests for medical attention. The

following jail employees had personal knowledge of this request: Cpl.

Tatum, Lt. Lynn, Lt. Patterson, and Sgt. Smith.

31.    Mr. Tilson was in clear medical distress to any person who interacted

with him or observed him during his confinement.

*Solitary Confinement*

32.    From March 4 to March 12th, Mr. Tilson was held in solitary

confinement in cell 11, which is located in the booking area of the jail.

33.    Cell 11 has a single metal shelf which functions as a bed, and a hole in

the floor covered with a metal grate for urination and defecation.

34.    Mr. Tilson's only clothing was a "suicide gown," which is a single piece of clothing designed to prevent it being used for a suicide.

35.    The majority of this time in cell 11, Mr. Tilson was completely naked.

36.    After being placed in solitary confinement, Mr. Tilson was the subject of two additional uses of force which occurred on March 6th and March 7th.

37.    The actions that led to each use of force were clear manifestations of Mr. Tilson's mental illness and psychiatric state.

38.    The reason for each use of force was due to Tilson's erratic behavior, which was, in turn, a clear manifestation of his psychosis.

39.    The following jail employees were aware of each use of force and the circumstances that surrounded it: Gordon, Little, Lynn, Patterson, Smith, Spear, Spivey, Tatum, and Tracey.

40.    After March 7th, there are no reported uses of force against Mr. Tilson.

41.    Upon information and belief, the reason officers stopped using force against Mr. Tilson is that they stopped letting him out of his cell at all.

42.    On March 9th , members of Mr. Tilson's family attempted to visit him during regular visiting hours.

43.    Mr. Tilson's family members were told by jail staff that they could not visit Mr. Tilson because he was "in solitary" and not permitted any visitation.

44.    The employee who informed Mr. Tilson's family members that he was not permitted visitation was acting pursuant to a policy and standard practice of the jail to refuse visitation to any inmate who was being held in solitary confinement.

45.    Members of Mr. Tilson's family tried to visit Mr. Tilson on other occasions. Each time, they were told he was not permitted to see visitors because he was "on restriction," or "in the hole," or some other similar term.

46.    At the time of this incident, Correct Care Solutions did not staff the Rockdale County jail with any mental health professional on Saturdays or Sundays.

47.   The reason Correct Care Solutions did not staff the jail with any mental health professional during the weekend is that the contract between Rockdale County and Correct Care Solutions did not require or authorize mental health professionals to work over the weekends.

48.   Sheriff Levett knew and approved of the amount of mental health care workers who worked in the jail pursuant to health care contract between Rockdale County and CCS.

49.   While there was a nurse employed by CCS on duty at the jail, each of the officers knew that neither that nurse nor any other medical professional would see him on March 10th or March 11th unless summoned by one of the officers.

50.   Because Mr. Tilson was in solitary confinement, and because his call button did not work, the only means he had to summon medical help was to ask the guards to summon medical personnel.

51.   It was also obvious to each employee who continued to oversee Mr. Tilson that he required immediate emergency mental health treatment.

52.    It was obvious to each employee Tilson was delusional, with

disorganized thoughts, paranoia, and impaired cognitive ability.

*The Jail's Use of Solitary Confinement*

53.    Mr. Tilson was placed in solitary confinement because he was

schizophrenic and in the midst of a psychotic break.

54.    Upon information and belief, the jail, with the the knowledge the

Sheriff, has a routine practice of housing individuals with severe

mental illness in solitary confinement.

55.    Individuals who suffer from physical disorders, illnesses, or

complications are not housed in solitary confinement.

56.    Individuals who are housed in solitary confinement due to disciplinary

reasons are treated differently than Mr. Tilson.

57.    For example, unlike mentally healthy individuals, Mr. Tilson's pleas,

screams, and requests for help were completely ignored.

58.    The reason the guards did not answer Mr. Tilson's pleas, screams, or

cries is because they regarded him as "crazy"—or some base

stereotype akin to it—and therefore undeserving of a response.

59.    Mr. Tilson's mental illness was the motivating factor behind the
decision to place him in solitary confinement, and to keep him in
solitary confinement.

60.    The denial of medical treatment to Mr. Tilson—including the failure
of any officer who over saw Mr. Tilson for the last three days of his
life to summon medical assistance at any point in spite of obvious
psychosis—was based upon negative perceptions and biases against
individuals who are in the midst of a psychiatric crisis.

61.    Other individuals who are placed in solitary confinement for non-
mental health reasons are not treated the same way as Mr. Tilson.

*The Effects of Solitary Confinement*

62.    The effect of solitary confinement upon a person who is in a state of
psychosis can have profound damaging consequences.

63.    Even among mentally healthy individuals, solitary confinement causes
hallucinations, illusions, and paranoid ideas. It causes individuals to
have emotional reactions, and to make impulsive decisions. It also

causes lethargy, debilitation, weight loss, malnourishment, and a host of other negative consequences.

64. The use of solitary confinement on individuals with severe mental illness presents an extreme hazard to their safety.

65. There is a growing national recognition that the use of solitary confinement—particularly when dealing with people with a severe mental illness—is  inhumane and cruel.

66. Solitary confinement exacerbated Mr. Tilson's mental illness and ensured that Mr. Tilson would continue to experience delusions, paranoia, and other symptoms of psychosis.

*The evening of Mr. Tilson's death*

67. On the evening of March 12, 2018, Shali Tilson died while incarcerated in the Rockdale County jail.

68. On March 12th, Mr. Tilson was the only inmate who was on suicide watch.

69. In the hours preceding his death, Mr. Tilson was naked and spent much of his time playing with garbage from his styrofoam lunch trays

17

on the concrete floor of his cell, which was the only possession he was allowed.

70. Part of the established policy governing individuals placed on suicide watch at the Rockdale County jail, is that each inmate must be checked every 15 minutes.

71. It is part of the then-established policy governing individuals placed on suicide watch that, when such individuals are checked, they are checked to ensure that they not only present, but also responsive.

72. Specifically, deputies at the jail are instructed that when they perform a suicide watch check, if the inmate is not moving, that they must tap on the window to ensure that the inmate is alert and responsive.

73. That evening, the following Defendants were responsible for performing routine 15 minute checks to determine that Mr. Tilson was not harming himself: Sgt. Lang, Deputy Tolbert, and Deputy Shired.

74. Tolbert, Shired, and Lang were not busy at work on the evening of Mr. Tilson's death. They were not occupied by other duties, and each had ample time to perform all required checks.

75.   These Defendants did not perform the required 15 minute checks of Mr. Tilson.

76.   At approximately 4 p.m., Sgt. Lang and Deputy Tolbert inserted a styrofoam tray into Mr. Tilson's cell which contained food.

77.   At about 4:45 p.m., Mr. Tilson pushed the non-functioning emergency call button in his cell.

78.   At about 5:00 p.m., Mr. Tilson sat against the wall of his cell, and rested his against the corner of the wall.

79.   At about 5:04 p.m., Mr. Tilson lost consciousness due to dehydration. His head dropped forward, and he remained in that exact position until his death.

80.   At approximately 5:45 p.m., Sgt. Lang checked the suicide watch log and saw that it had not been signed since 3:00 p.m..

81.   Sgt. Lang did not actually check on Mr. Tilson at 5:45 p.m. when he signed the suicide log.

82.   Sgt. Lang falsified the suicide watch logs, and signed for suicide watch checks which did not occur.

83.    From 4 p.m. until 7:30 p.m., no person checked on Mr. Tilson.

84.    The first time anyone checked on Mr. Tilson after 4:00 p.m. was Sgt. Lang, who checked on Mr. Tilson at approximately 7:30 p.m.

85.    At 7:30 p.m., Sgt. Lang falsified the suicide watch logs and signed that checks had been completed every 15 minutes since 5:45 p.m. In reality, the last check that occurred was at 4:00 p.m.

86.    At 7:30 p.m., Mr. Tilson was seated on the floor and leaning back against the wall with his head dropped forward. It was apparent that Mr. Tilson was not sleeping. Mr. Tilson was not otherwise moving, and was non-responsive.

87.    At 7:30 p.m. check made by Sgt. Lang, he made no effort to determine whether Mr. Tilson was responsive.

88.    If Defendants Lang, Tolbert, or Shired had performed the suicide watch checks are required by Sheriff's office policy, they would have learned that Mr. Tilson was non-responsive fifteen (or fewer) minutes after Mr. Tilson lost consciousness.

89.  The next time anyone checked on Mr. Tilson was approximately 8:25 p.m.

90.  Defendants Lang, Tolbert, and Shired were each in a position to check on Mr. Tilson and failed to do so.

91.  The emergency call buttons inside the suicide watch cells did not work.

92.  Tolbert, Shired, and Lang knew that the emergency call button in Mr. Tilson's cell did not work.

93.  Had Tolbert, Shired, and Lang performed those checks as required by official policy, they would have noticed *at maximum* fifteen minutes later that Mr. Tilson was slumped against a wall of his cell with his head drooping over, and that he was non-responsive.

94.  If Mr. Tilson received emergency medical attention even *one hour* after the time he lost consciousness, he could have easily been saved if he had received intravenous fluids and other medical aid.

95.  If medical aid had been summoned at any point on the day of his death, it would have been readily apparent to any medical practitioner

that, based on Mr. Tilson's outward appearance alone, he was in a state of severe dehydration.

*Drinking Water*

96. When Mr. Tilson entered the jail, he was in good physical health.

97. Mr. Tilson did not receive an adequate supply of water for a period of at least three days prior to his death.

98. Mr. Tilson was not supplied adequate water caused by neglect that was motivated by discrimination against Mr. Tilson due to his being schizophrenic, and the manifestations of that disease.

99. In the alternative, Mr. Tilson was not supplied adequate water because the guards at the jail who over-saw him failed to provide water to him due to an established pattern of neglect, whereby guards would shirk their routine and ministerial duties and neglect to ensure basic humane conditions of confinement to those in solitary confinement.

100. No guard checked to ensure that Mr. Tilson consumed whatever water he was given.

101.   No policy exists which require guards to ensure that inmates on

suicide watch are consuming fluids.

*Spoliation*

102.   The jail is equipped with security cameras that captured Mr. Tilson's

activities in his cell from March 9th to March 12.

103.   All video which captured the inside and outside of Mr. Tilson's cell

from March 9th to until 4 p.m. on March 12th has been lost or deleted

by jail staff.[6] Beyond these missing videos, there are additional

missing videos which would have shown Mr. Tilson's time in solitary

confinement.

*Damages*

104.   The actions of each Defendant caused Mr. Tilson to endure violations

of his constitutional and statutory rights prior to his death. This

resulted in mental and physical pain and suffering prior to his death.

105.   Mr. Tilson's estate is entitled to recover damages for pre-death pain

and suffering caused by each Defendant.

---

[6] At this point, Plaintiffs do not have a clear explanation as to
why these videos were not preserved, or what steps were taken to preserve them.

106.    The actions of each Defendant in this case were the proximate cause of Mr. Tilson's death.

107.    Mr. Wilson's parents are entitled to recover the full value of Mr. Tilson's life from each Defendant.

<u>Count I</u>
*Violation of Ministerial Duty under Georgia law*
*against Sgt. Lang, Deputy Tolbert, and Deputy Shired*
*arising from the failure to perform mandated suicide watch supervision*

108.    The duties described above, whereby these Defendants failed to perform health and safety checks on Mr. Tilson on the evening of his death, constitute ministerial duties.

109.    These Defendants breached those duties by failing to perform the health and safety checks.

110.    As set forth above, Mr. Tilson would have survived had medical assistance been summoned before he stopped breathing.

<u>Count II</u>
*Deliberate Indifference under 42 U.S.C. § 1983*
*against the Guards and Watch Commanders for the denial of adequate water and*
*denial of medical care*

111.  This Count is offered against named non-parties who include the

deputies who were assigned to Mr. Tilson's area of the jail and those

who supervised those deputies. *See* ¶¶ 8, 9, *supra*.

112.  These officers did not supply Mr. Tilson with adequate water, did not

ensure that Mr. Tilson consumed water that he was given, and did not

summon medical help in spite of an ongoing crisis.

113.  As discovery progresses, Plaintiff will amend this complaint to name

the responsible parties.

<u>Count III</u>
*Supervisory liability under 42 U.S.C. § 1983*
*against Sheriff Levett in his individual and official capacities*
*arising from the denial of medical treatment*

114.  Although the County contracts medical services to a private

corporation, that private corporation is not responsible for the

provision of all medical services at the jail.

25

115.  Specifically, the Sheriff's office must serve as a liaison between
      inmates and medical staff, must alert medical staff to inmates'
      medical concerns, and must assist medical staff in triage,
      communication, and monitoring inmates under medical supervision.

116.  The Sheriff's functions as they relate to the provision of medical care
      are performed on behalf of the County, which is statutorily obligated
      to provide medical services to inmates at the jail.

117.  In 2015, there were 5,729 inmates booked into the Rockdale County
      jail, and 1,039 of them referred for mental health issues during
      medical intake. Only 480 of those inmates were seen by mental health
      staff.

118.  In 2016, there were 3,157 inmates booked into the Rockdale County
      jail, with 788 having mental health issues. Only 380 of those inmates
      were assessed by medical services.

119.  Upon information and belief, as a matter of routine practice, the
      Rockdale County jail routinely does not create mental health referrals
      in circumstances in which they would otherwise be warranted.

120.   Mr. Tilson's mental illness and state of psychosis were obvious and

apparent to at least thirty individual deputies of the Sheriff's office

between the dates of March 3rd and March 12th.

121.   Over twenty Sheriff's office employees observed Mr. Tilson's

continued state of psychosis from March 9th through March 12th,

which was a time span during which each of those employees knew

that Mr. Tilson would not be seen by a doctor or medical professional

absent a referral from Sheriff's office staff.

122.   No Sheriff's office employee took any action whatsoever and

continued to keep Mr. Tilson locked in solitary confinement.

123.   Such a widespread occurrence—whereby dozens of employees acted

according to a common operation—demonstrates the existence of an

unwritten policy and routine practice to sequester those with

psychosis in solitary confinement.

124.   The Sheriff was personally aware of this practice, and took no steps to

halt it.

125.  The Sheriff's conduct ratified the policy of sequestering psychotic arrestees in solitary confinement.

126.  The actions of Defendants Lang, Tolbert, and Shired also demonstrates the customary indifference of the Sheriff's office to medical needs, and particularly to those on suicide watch.

127.  These three Defendants failed to complete required suicide watch checks, falsified logs, and shirked their duties to monitor Mr. Tilson.

128.  This neglect of duties was customary in the jail when Mr. Tilson died, and guards regularly failed to perform suicide watch checks, and would sign forms indicating that those checks had been formed.

129.  The Sheriff is the policy maker and has final decision making authority as to whether an inmate is housed in solitary confinement or not.

130.  The Sheriff is the policy maker and final decision maker on the issues of setting rules and providing training to deputies as it relates to: (a) severe mental illness; (b) when to call medical assistance; (c) suicide watch; and (d) procedures governing how to conduct suicide watch.

131.  By implementing these quasi-medical decisions, the Sheriff acts on behalf of the County, in fulfillment of its statutory obligation to provide medical care to inmates.

Count IV

*Discrimination under the Americans With Disability Act and Rehabilitation Act*
*Against Sheriff Levett in his Official Capacity and against Rockdale County*

132.  Both Rockdale County and the Sheriff's Office are public entities under 42 U.S.C. § 12131(1).

133.  As recipients of federal funds, the Sheriff and Rockdale County are required by Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794) to make reasonable accommodations to persons with disabilities in their facilities, program activities and who receive their services. Such recipients are further required to modify such facilities, services, and programs as necessary to accomplish this purpose. Accordingly, these Defendants are subject to the mandate of Section 504.

134.  Mr. Tilson was disabled within the meaning of the ADA, 42 U.S.C. § 12131(2), because he has a mental impairment that substantially limits one or more of his major life activities.

135.   Rockdale County is statutorily obligated to provide medical treatment
       to individuals incarcerated in the Rockdale County Jail. *See* O.C.G.A.
       § 42-5-2.

136.   Rockdale County contracts with Correct Care Services, LLC to
       provide health services in the jail.

137.   The County has the sole authority to determine the medical contractor
       for the jail, and determines the terms of the contract to provide
       services.

138.   The Sheriff is responsible for overseeing the jail, and to ensure that
       medical care is summoned by deputies if no medical personnel are
       available.

139.   The Sheriff acts as an arm of the County insofar as he sets policy and
       oversees practices which relate to summoning medical care for
       individuals in medical need, and for supervising individuals who are
       on suicide watch.

140.  As detailed in the factual allegations above, both the officers and the
      medical personnel who were involved in Mr. Tilson's confinement
      and care acted with discriminatory animus resulting from the fact that
      Mr. Tilson was mentally ill and psychotic.

141.  Mr. Tilson should have been provided accommodations to the jail's
      solitary confinement policies, and such such accommodations could
      have been provided without constituting a substantial alteration in the
      jail's services. For example, Mr. Tilson should have been transferred
      to a psychiatric hospital rather than a held in solitary confinement in
      the same way a mentally healthy inmate would have been.

142.  Mr. Tilson should have been provided the basic necessities of life,
      such as food, water, and basic sanitation, which provided to other
      inmates but denied to him, and was denied those provisions due to his
      disability.

143.  Mr. Tilson should have been allowed to visit with his family or to
      otherwise correspond with them.

Count V
*Attorney's Fees*
*against all Defendants*

144.  Plaintiffs seek attorneys fees against Defendants Lang, Tolbert, and

Shired under O.C.G.A. § 13-6-11 as Defendants have acted in bad

faith, been stubbornly litigious, and caused the plaintiff unnecessary

trouble and expense.

145.  Plaintiffs also seek attorney's fees under 42 U.S.C. § 1988(b), 42

U.S.C. § 12205, and 29 U.S.C. § 794a(b) for their causes of action

under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the

Rehabilitation Act.

<u>REQUEST FOR RELIEF</u>

WHEREFORE, on the basis of the foregoing, Plaintiffs respectfully pray that this Court:

a)    Assume jurisdiction over this action;

b)    Hold a trial by jury on all issues so triable;

c)    Award general, nominal, and special damages to Mr. Tilson's estate for damages incurred before his death in an amount determined by a jury;

d)    Award general, nominal, and special damages to Ms. Tilson and Mr. Joseph for the value of Mr. Tilson's life in an amount determined by a jury;

e)    Award punitive damages against each Defendant who has been sued in their individual capacity;

f)    Award reasonable attorney's fees, expenses, and costs of litigation;

g)    Award such other and further relief as this Court deems just and equitable.

Respectfully submitted this 26th day of March, 2019.

s/Mawuli M. Davis
Mawuli M. Davis
Georgia Bar No. 212029

s/Harold W. Spence
Harold W. Spence
Georgia Bar No. 671150

THE DAVIS BOZEMAN LAW FIRM, PC
4153-C Flat Shoals Parkway, Suite 332
Decatur, Georgia 30034
404.244.2004
mdavis@davisbozemanlaw.com
hspence@davisbozemanlaw.com

s/Jeffrey R. Filipovits
Jeffrey R. Filipovits
Georgia Bar No. 825553

FILIPOVITS LAW, PC
2900 Chamblee-Tucker Road
Building 1
Atlanta, Georgia 30341
678.237.9302
jeff@law.filipovits.com