**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| THE ESTATE OF SHALI TILSON, TYNESHA RENEE TILSON and VLADIMIR JOSEPH, the parents of Shali Tilson, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| | ) | CIVIL ACTION |
| v. | ) ) | 1:19-cv-1353-JPB |
| SHERIFF ERIC J. LEVETT, in his individual and official capacities, CAPTAIN NIKIE WEATHERSBY, SERGEANT DAN LANG, DEPUTY ERIC TOLBERT, DEPUTY LADEAN SHIRED, LIEUTENANT PATTERSON, CORPORAL KLEIN, LIEUTENANT BOGARDTS, SERGEANT JORDAN GUILLEBEAU, LIEUTENANT NICHOLAS LYNN, CORPORAL SHARON WILSON, SERGEANT JACKIE BISHOP, in their individual capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**THIRD AMENDED COMPLAINT**

1

Plaintiffs offer this amended complaint pursuant to this Court's allowing Plaintiffs until January 30, 2020, to file a Third Amended Complaint. *See* Doc. 63.

*Parties*

1. Plaintiff Tynesha Renee Tilson is the mother of Shali Tilson. Ms. Tilson is a resident of the State of Georgia and over the age of eighteen.

2. Plaintiff Vladimir Joseph is the father of Shali Tilson. Mr. Tilson is a resident of the State of Georgia and over the age of eighteen.

3. The Estate of Shali Tilson was established by order of the Probate Court of Rockdale County. The Estate sues to recover damages for pain and suffering which occurred prior to the death of Mr. Tilson.

4. Tynesha Tilson and Vladimir Joseph hold the right to pursue the claims arising from their son's death. Shali Tilson never married and did not have any children.

5. Defendant Sheriff Eric J. Levett is the elected Sheriff of Rockdale County, and was the Sheriff at all times relevant to this complaint.

6. Defendant Nikie Weathersby was the Jail Commander of the Rockdale County Jail in March 2018 and at all times relevant to this complaint. She is sued in her individual capacity.

7.    Defendants Lang, Tolbert, and Shired are three Sheriff's deputies employed by the Rockdale County Sheriff. These three deputies were assigned to oversee Mr. Tilson on the evening of his death, and acted under the color of law.

8.    Defendants Patterson, Klein, Bogardts, Guillebeau, Lynn, Wilson, and Bishop are Sheriff's deputies who were employed by the Sheriff at all times relevant to this complaint. These Defendants served as jailers in the Rockdale County Jail and acted as Watch Commanders and Booking Commanders during Tilson's incarceration.

9.    Non-party Wellpath LLC (formerly known as Correct Care Solutions, LLC ("CCS")), is a private for-profit limited liability company based in Tennessee. At the time of the events giving rise to this lawsuit, CCS contracted with the County to provide medical services (including mental health services) to people incarcerated in the Rockdale County jail.

*Jurisdiction and Venue*

10.  This action arises under the authority vested in this Court by virtue of  28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

3

11.    This Court has supplemental jurisdiction of Plaintiffs' state law claims under 28 U.S.C. § 1367.

12.    Upon service of process, this Court acquires personal jurisdiction of Defendants under Fed. R. Civ. P. 4(k)(1)(a).

13.    Venue is proper in the Atlanta Division of the Northern District of Georgia under 28 U.S.C. § 1391(b) because all actions complained of occurred within the boundaries of this District and Defendants reside within this District.

*Chain of Command and Job Duties*

14.    Within the Sheriff's Office, there are four Captains who oversee different divisions of the Office.

15.    One Captain, Nikie Weathersby, oversees the Jail and serves as Jail Commander.

16.    The other Captains do not oversee Jail operations and have limited to no role in Jail operations.

17.    Each shift at the Jail is overseen by a Watch Commander.

18.    Generally, a lieutenant serves as Watch Commander. If a lieutenant is unavailable, then a Sergeant serves as Watch Commander.

4

19.     These Watch Commanders report directly to Captain Weathersby.

20.     Watch Commanders oversee about 30 employees per shift, including the medical staff.

21.     For each shift at the Jail, there are two supervisors who report to the Watch Commander during a shift: the Booking Commander and the Cell Block Supervisor.

22.     Watch Commanders often simultaneously worked as Booking Commander. In that case, they were required to fulfill the duties of both positions.

23.     Booking Commanders' responsibilities include processing new inmates or releases, coordinating pick ups or drop offs of inmates from other jails or prisons, answering phone calls, direct contact with public, and other similar duties.

24.     Booking Commanders also oversee the care of inmates who are housed in the booking area of the jail, including those who are in solitary confinement, segregation, and suicide watch.

25.     Booking Commanders are obligated to ensure that all medical and segregation logs are up to date.

26.     Booking Commanders are responsible for ensuring that inmates housed in the booking area have access to showers, phones, recreation time, and meals. All such activities must be noted on a log book used by other Booking Commanders, Booking Deputies, and Watch Commanders.

27.     Generally two booking deputies work under each Booking Commander per shift. These deputies regularly rotate throughout the Jail on various jobs, and there is no specific schedule or rotation of workers.

28.     These Booking Deputies share responsibilities with the Booking Commander in tending to all duties related to booking, releasing, transporting, and processing inmates. They are also responsible for overseeing the inmates who hare held in segregation cells in the booking area of the Jail.

*Tilson's arrival at the Jail*

29.     On the morning of March 3, 2018, police officers employed by the City of Conyers arrested Shali Tilson who was then twenty-two years old.

30.     When Mr. Tilson was arrested, it was obvious and apparent that he was in the midst of a mental health crisis.

31.   For example, prior to and during his arrest, Mr. Tilson yelled words and phrases that revealed that his mental state was completely detached from reality. The things Mr. Tilson said and did bore no relation to what was occurring around him.

32.   Mr. Tilson was charged with misdemeanor disorderly conduct and misdemeanor obstruction of justice.

33.   After arresting Mr. Tilson, police officers employed by the City of Conyers transported him to the Rockdale County Jail.

34.   Upon his arrival at the jail, Mr. Tilson remained in an obvious state of extreme mental distress.

35.   The following officers were involved in receiving and booking Tilson: Sgt. Guillebeau, Cpl. Tatum, Deputy Lightford, and Deputy Kilgore.

36.   Upon the arrival of City of Conyers police officers at the jail, officers with the City informed Sgt. Guillebeau that the City of Conyers police officers did not know Mr. Tilson's name, and that Mr. Tilson was acting erratically and that the words Mr. Tilson was saying did not make sense.

37.   Sgt. Guillebeau then made contact with Mr. Tilson, and Sgt. Guillebeau also observed that Mr. Tilson was in an extreme mental health crisis because Mr.

Tilson simply began screaming "n*****" and making other nonsensical statements.

38. Mr. Tilson refused to exit the back of the police car and physically resisted Sgt. Guillebeau's attempts to remove him.

39. Sgt. Guillebeau then told Deputy Lightford to retrieve a four-point restraint chair. After Lightford arrived with the chair, Sgt. Guillebeau and Cpl. Tatum removed Tilson from the backseat and placed him in the restraint chair and secured all restraints. Deputy Lightford punched Tilson while restraining him. The deputies then transported Mr. Tilson into the booking area to cell 11.

40. On March 4, 2018, jail staff used force on Tilson on for separate occasions.

41. Each use of force was preceded by Mr. Tilson acting in an erratic and unpredictable—but not violent—manner that was directly related to his mental health crisis. For example, Mr. Tilson would attempt to exit his cell, or he would feebly attempt to escape while being transported.

42. When Mr. Tilson arrived at his new cell, he was speaking loudly, wild eyed, and shaking. Mr. Tilson stated "I got these bumps all over my skin," and made repeated requests for medical attention. The following jail employees

8

had personal knowledge of this request: Cpl. Tatum, Lt. Lynn, Lt. Patterson, and Sgt. Smith.

43. Any person who interacted with Tilson or observed him during his confinement could see he was in clear medical distress.

*Tilson's time in general population*

44. While in general population at the Jail, Tilson continued to show signs of mental impairment.

45. Jail staff repeatedly used force against Tilson because of this impairment.

46. These uses of force occurred on March 3 and March 4. Each use of force involved Tilson's failure to obey orders or attempt to squirm away from deputies. Neither Tilson nor any deputy was injured in any of the incidents.

*Tilson's transfer to HC 11*

47. On March 6, 2018, at about 6am, Tilson was transferred to Holding Cell 11.

48. The previous use of force against Tilson occurred on March 4. Between March 4 and March 6, Tilson did not fight with guards or engage in any conduct that would warrant any additional use of force.

49. Nevertheless, Tilson remained animated, disassociated, and was in an obvious state of mental distress.

9

50.     Numerous inmates who observed Tilson were able to discern that he was in need of psychiatric care.

51.     Prior to being transferred, Tilson was disruptive while house in general housing in the Jail.

52.     This disruption was a clear manifestation of Tilson's mental illness.

*No medical staff or CCS employee was involved in the decision to transfer Tilson to HC 11.*

53.     On March 6, Sheriff's deputies transferred Tilson to segregated housing.

54.     Lt. Lynn advised staff that Tilson would be transferred to HC 11 due to the previous uses of force against him.

55.     Although Tilson was not actually placed on suicide watch by any mental health professional—under Jail policy, Sheriff's deputies do not have the authority to place him on suicide watch—Tilson was thereafter regarded as being on "suicide watch."

*Housing an inmate in HC 11 or 12*

56.     There are two cells in the jail which are called "padded rooms": Holding Cell 11 and Holding Cell 12.

57.     These cells are locating in the booking area of the Jail.

58. The booking area is a heavily traveled portion of the Jail. *See* Exhibit A and B.



*Exhibit A: The Jail's Booking Area*



*Exhibit B: Second View of the Jail's Booking Area Showing HC 11*

59.    The booking area also houses other isolation cells, but those cells have
       running water, toilets, and beds.

60.    HC 11 and 12 are the only rooms that have no furniture, no bed, and no sink
       or other source of water.

61.    HC 11 and 12 do not have toilets; instead, there is a hole in the floor
       covered by a metal grate for urination and defecation. *See* Exhibit C.



*Exhibit C: The "toilet" in HC 11*

62. HC 11 and 12 are approximately 5 feet by 10 feet.

63. HC 11 and 12 are used by the Jail to hold inmates who have been placed on suicide watch for observation.

64. HC 11 and 12 are also used to punish inmates who have violated Jail rules.

65. HC 11 and 12 are not the only cells used for suicide watch, and other isolation cells in booking are also used for inmates placed on suicide watch which have running water, toilets, and bed.

66. Jail staff (not medical staff or CCS employees) have the sole authority to determine whether to house an inmate on suicide watch in HC 11 or 12, or in the other isolation units.

67. Anyone ranked Sergeant or above could have changed Tilson's cell assignment without the need for additional approval.

68. HC 11 and 12 are meant to be short-term holding cells.

69. Prior to Tilson's incarceration, no inmate had been housed in these cells for more than two to three days.

70. When an inmate is placed in HC 11 or 12, an administrative segregation order must be completed.

71. No one ever completed an administrative segregation order for Shali Tilson.

72.   Each of the Supervisor Defendants knew that no administrative segregation order had been completed for Shali Tilson.

73.   Under Jail policy, a hearing must be completed with 72 hours of an inmate's placement in segregation, and a copy of that hearing must be forwarded to Jail Administration for review.

74.   No such hearing was ever held for Shali Tilson.

*Tilson's time in HC 11*

75.   Plaintiffs incorporate by reference the electronic media previously filed in this case as being representative of Tilson's time in HC 11. *See* Doc. 54. That physical filing contains the following: `Tilson 2.avi`, `Tilson 3.avi`, and `Booking 2 Cam 11(HC11) 1600-2359.avi`

76.   `Tilson 2.avi` and `Tilson 3.avi` show Tilson in Cell 11 from 3:00 p.m. to 3:08 p.m on March 12, 2018.

77.   `Booking 2 Cam 11(HC11) 1600-2359.avi` shows Tilson in his cell from 4:00 p.m. on March 12th until he is found dead and removed at approximately midnight.

78.   The conditions shown in these files demonstrate the conditions in which Mr. Tilson was held from March 6th through March 12th.

14

79.     The following chart shows each Supervisory Defendants' shifts during

Tilson's time in HC 11. (The shift names refer to the time when the shift

ended. The "morning shift" actually worked through the night and into the

next morning. Hence, no morning shift is shown for March 12, since Tilson

died during the evening shift of March 12.)

| Date | Shift | Name | Booking Commander | Watch Commander |
|------|-------|------|-------------------|-----------------|
| 3/7 | Day | Patterson | | X |
| 3/7 | Evening | Bogardts | | X |
| 3/7 | Evening | Lang | X | |
| 3/7 | Morning | Lynn | | X |
| 3/7 | Morning | Bishop | X | |
| 3/8 | Day | Patterson | X | X |
| 3/8 | Evening | Bogardts | X | X |
| 3/8 | Morning | Guillebeau | X | |
| 3/9 | Day | Patterson | X | X |
| 3/9 | Evening | Bogardts | X | X |
| 3/9 | Morning | Bishop | | X |
| 3/9 | Morning | Wilson | X | |
| 3/10 | Day | Patterson | X | X |
| 3/10 | Evening | Klein | X | X |
| 3/10 | Morning | Guillebeau | X | X |
| 3/11 | Day | Patterson | X | X |
| 3/11 | Evening | Klein | X | X |
| 3/11 | Morning | Lynn | X | X |
| 3/12 | Day | Patterson | X | X |
| 3/12 | Evening | Bogardts | | X |
| 3/12 | Evening | Lang | X | |

15

80.   The following allegations relate to the knowledge of each individual Supervisory Defendant. When referred to as a group, Plaintiffs charge each individual Defendant with the knowledge alleged. Where group allegations are not appropriate because a Defendant has specific knowledge, that Defendant is referred to individually. To the extent the scope of each Supervisory Defendants' knowledge is based on their personal observations of Tilson, Plaintiffs' allegations incorporate the preceding chart to demonstrate the days and times during which those Supervisors would have had oversight over Tilson and the jailers assigned to booking.

*Unusual length of Tilson's confinement*

81.   Each Supervisory Defendant knew that the time Tilson spent in HC 11 was longer than any other inmate had previously been there.

82.   Each Supervisory Defendant knew that Tilson had been held in solitary confinement since March 6 because that information is clearly marked on forms and logs used by each Supervisory Defendant.

83.   Each Supervisory Defendant knew that Tilson had not been allowed out of his cell since March 6 because that information is clearly marked on forms

and logs used by each Supervisory Defendant, because that information was commonly known to deputies who worked in the booking area.

*Knowledge of the lack of medical basis for "suicide watch"*

84. Each Supervisory Defendant knew there was no medical basis for Tilson to be on suicide watch because: the form to initiate suicide watch was not present; no medical provider ever stated he was on suicide watch; and none observed or heard of any suicidal behavior.

85. Each Supervisory Defendant knew deputies, including themselves, did not follow suicide watch protocol. For example, each that a substantial amount of garbage had accumulated inside Tilson's cell, and that this garbage itself create the risk of suicide. Nevertheless, the Supervisory Defendants allowed that garbage to continue to accumulate contrary to policy and their training.

86. Specifically, all deputies are instructed to remove plastic bags for any individual on suicide watch. The debris in Tilson's cell on March 12 shows that deputies did not follow this policy. *See* Exhibit 3.



*Exhibit 3: Debris and Fluid in Tilson's Cell*

87.   Each Supervisory Defendant knew that no one at the Jail had meaningfully

communicated with Tilson, and that Tilson appeared to be unable to

communicate.

88.   Each Supervisory Defendant knew there was no policy requiring medical

staff to check on inmates who were in HC 11 or 12.

18

*Knowledge of the conditions of Tilson's cell*

89.     Exhibit 4 shows the garbage that had accumulated in Tilson's cell on March

12, 2018.



*Exhibit 4: Garbage accumulated in Tilson's cell on March 12*

90.     Exhibits 5 and 6 show feces and other filth which covered the floors and

walls of HC 11.

19



*Exhibit 5: Sanitary Condition of Tilson's Cell on March 12, 2018*



*Exhibit 6: Sanitary Conditions of Tilson's Cell on March 12, 2018*

91.   Each Supervisory Defendant knew the cell had not been cleaned since March 6.

92.   Each Supervisory Defendant knew Tilson had not been allowed out of his cell since March 6.

93.   Each Supervisory Defendant knew the lights in the cell were on 24-hours a day.

94.   Each Supervisory Defendant knew that the toilet was flushed at irregular intervals because that was standard practice and each Defendant did not engage in or enforce any regular schedule.

95.   Each Supervisory Defendant knew that Tilson had no soap, no toilet paper, and no toothbrush nor was he allowed to use any at any point.

96.   Each Supervisory Defendant knew that Tilson's cell was smeared with feces.

97.   Each Supervisory Defendant knew that Tilson's cell had a foul odor.

98.   Each Supervisory Defendant knew that jailers had placed towels at the foot of Tilson's door to soak up urine and spilled water.

99.   Each Supervisory Defendant knew that, for periods of time, deputies would place a drape over Tilson's cell window so Tilson could not see out, in an

attempt to "calm him down" because each Defendant saw this occur, knew it occurred based upon discussions with other deputies.

100. Each Supervisory Defendant knew that the emergency call button in Tilson's cell did not work because the alarm attached to the button never activated during Tilson's time the cell, the call buttons in other cells did not work, and the emergency call buttons were generally in a state of disrepair.

*Knowledge of the use of HC 11 as a means of punishment*

101. Each Supervisory Defendant knew that Tilson was not allowed out of his cell because of prior instances in which Tilson was the subject of uses of force.

102. Each Supervisory Defendant knew that, pursuant to policy and practice, HC 11 and 12, in addition to being used for suicide watch, were used to punish inmates who acted erratically or displayed signs of mental illness.

103. Each Supervisory Defendant knew that the Rockdale County jailers placed inmates in padded cells to punish those inmates for acting out.

104. Each Supervisory Defendant participated in the process of punishing Tilson for his previous actions by keeping him locked in HC 11.

105.   The Supervisory Defendants each knew that Tilson was in segregation for longer than 72 hours.

106.   The Supervisory Defendants knew that no hearing was ever held for Shali Tilson.

107.   Jail policy requires that, if segregation is used for an inmate with mental health concerns, such treatment must be approved by the facility physician.

108.   The Supervisory Defendants each knew that Tilson's treatment was not approved by the Jail's physician and there was no plan whatsoever for what to do with Tilson, other than keep ignoring him.

*Knowledge of lack of water*

109.   Each Supervisory Defendant knew that Tilson regularly dumped water, refused water, or threw water back at jailers because that subject was discussed by jailers and supervisors during shift changes and informally at other times.

110.   Each Supervisory Defendant knew that some deputies at the jail did not regularly provide water to Tilson when they served meals because this was an established and understood practice at the Jail because those statements

were made during shift changes and were discussed between jailers informally at other times.

111. Each Supervisory Defendant knew that at least some jailers responded to Tilson's actions by stating they would not offer him water on their shift because these statements were made or repeated during shift changes and were informally discussed between jailers informally at other times.

112. Each Supervisory Defendant knew that, by policy and as a repeated practice, no one was specifically delegated the task of providing water.

113. Each Supervisory Defendant knew that shift commanders did not, as a matter of practice, specifically delegate the task of providing water to inmates in HC 11 or 12, and no Supervisory Defendant ever specifically delegated the task.

114. Each Supervisory Defendant knew that no logs were maintained showing whether, and when, water had been provided or refused to an inmate in HC 11.

115. Each Supervisory Defendant knew that the only way for Tilson to get water was to bang on the door and ask for it, and knew that deputies did not

routinely ask Tilson if he needed water to drink because this was the established practice at the Jail.

116. Each Supervisory Defendant knew that Tilson repeatedly banged on the door, kicked the door, yelled, and cried out for help and asked for water because they personally observed it, read about it in end-of-shift logs, discussed it in roll call meetings, and discussed it amongst themselves informally.

117. Each Supervisory Defendant knew that water could only be provided in 8 oz. cups because that is the only size cup that would fit through the flap of HC 11.

118. Each Supervisory Defendant knew that jailers, including themselves, routinely ignored Tilson for extended periods of time because they participated in it and observed others doing it.

119. Each Supervisory Defendant knew that CCS employees had no authority to provide food, water, or to change Tilson's cell assignment because that was the established policy and practice of the Jail.

120. Each Supervisory Defendant knew that no one at the Jail had any training concerning the amount of water a person must consume to stay alive, the

amount of water that should be served, or the symptoms of dehydration because they had never received such training and never heard of someone receiving such training.

*Knowledge of Tilson's delirium*

121. Each Supervisory Defendant knew that of Tilson's erratic behavior inside his cell because they personally observed it, read about it in end-of-shift logs, and discussed it with other deputies.

122. Each Supervisory Defendant knew that Tilson yelled and screamed incoherent things for sustained periods of time while in HC 11 because they personally observed it, read about it in end-of-shift logs, and discussed it with other deputies.

123. Each Supervisory Defendant knew that Tilson banged on the door, and threw himself against the door and wall because they personally observed it, read about it in end-of-shift logs, and discussed it with other deputies.

124. Each Supervisory Defendant knew that no other jailer had been able to meaningfully communicate with Tilson because Tilson's psychological state made it obvious that he was unable to do so, no jailer ever claimed to have

communicated with him, and no Supervisor or deputy they supervised was able to communicate with Tilson.

125.    Each Supervisory Defendant knew that Tilson behavior showed a disconnect from reality based upon their personal observations of Tilson and the other information learned from the sources set forth above.

126.    Each Supervisory Defendant knew that Tilson's sleeping intervals were highly irregular and erratic due to their personal observations of Tilson, and information communicated during shift changes and roll call.

*Knowledge of lack of medical treatment*

127.    Each Supervisory Defendant knew that Tilson did not receive any medical treatment, and had not been seen by a doctor because there none of the required forms mandating physician approval were present in Tilson's file, each Supervisory Defendant reviewed that file, and knew that they had no other knowledge that a doctor had seen Tilson and were not told that a doctor had seen Tilson.

128.    No Supervisory Defendant communicated with CCS staff regarding Tilson's physical or mental health, in spite of being required to do so as a matter of

policy. Each Supervisory Defendant knew that no other Supervisory Defendant or jailer had stated they had communicated with CCS.

129.   Each Supervisory Defendant who worked on March 10 and 11 (i.e., Defendants Patterson, Klein, Guillebeau, and Lynn) knew that from March 10 to March 11, no mental health provider would see Tilson unless requested by deputies because each knew that mental health professionals employed by CCS did not work on the weekend.

130.   Each Supervisory Defendant knew that suicide watch initiation forms had not been completed by any jailer or CCS employee because those forms were required, but not part of Tilson's file and each had reviewed Tilson's file.

*Knowledge of the general failures at the Jail*

131.   Each Supervisory Defendant knew that jailers at the jail were often over worked and asked to fill multiple roles during each shift.

132.   Each Supervisory Defendant knew that job duties at the Jail were blurred because responsibilities between booking deputies were not well-defined.

133.   Each Supervisory Defendant knew the jail was generally understaffed.

134.   Each Supervisory Defendant knew these under-staffing issues often meant that some duties were not performed as required by policy.

135.   Each Supervisory Defendant knew of the general failure for jailers to perform suicide watch checks.

136.   For example, on March 10, no suicide watch checks were performed during the day shift, and the suicide watch form was not signed by Defendant Patterson. Deputy Klein used the same form, and knew that no checks had been performed.

137.   Likewise, on March 7, no suicide watch checks were performed between 7am and 8am and 2pm and 3pm during Defendant Patterson's shift. During Defendant Bogardts' and Defendant Lang's evening shift, no suicide watch checks were formed from 7:00pm to 11pm.

138.   On March 12, suicide watch checks were not performed by Defendants Lang, Tolbert, or Shired. No suicide watch check was performed from 6 p.m. onward, and Defendant Lang falsified the suicide watch log by "back filling" it, indicating that suicide watch checks had been performed when they had not.

139.   On March 6, Tilson receives two cups of water; sixteen ounces total.

140.   The supervisors on March 6 were Patterson, Bogardts, Lang, and Guillebeau.

141.   On March 7, Tilson received three cups of water; twenty-four ounces total.

142.   The supervisors on March 7 were Patterson, Bogardts, Lynn, Lang, and Bishop.

143.   On March 8, Tilson received two cups of water; sixteen ounces total.

144.   The supervisors on March 8 were Bogardts, Guillebeau, and Patterson.

145.   Each Supervisory Defendant knew that some deputies at the jail performed suicide watch checks by looking at a closed-circuit television monitor, which did not provide a clear view into Tilson's cell because they observed and heard of jailers doing this.

146.   Each Supervisory Defendant knew that performing suicide watch checks in this manner violated Jail policy, but never took corrective action.

147.   Each Supervisory Defendant knew that forms, logs, and records at the jail were routinely filled out with false information, incomplete information, and were otherwise unreliable. For example, each Supervisory Defendant filled out forms and logs with the wrong date, failed to fill out forms, failed to supply required information, and back-filled logs, meaning that they

completed time logs indicating they had performed a task in spite of the fact that they had not.

*Authority to move Tilson to new cell*

148. Each Supervisory Defendant had the authority to move Tilson to a different cell because a Sergeant or Lieutenant has that authority.

149. Each Supervisory Defendant knew the following was the feeding schedule for the last three days of Tilson's life:

| Date | Meal time | Status |
|------|-----------|--------|
| 3/10 | Morning | Refused |
| 3/10 | Day | Not offered |
| 3/10 | Evening | Accepted |
| 3/11 | Morning | Accepted |
| 3/11 | Day | Refused |
| 3/11 | Evening | Refused |
| 3/12 | Morning | Not offered |
| 3/12 | Day | Accepted |
| 3/12 | Evening | Accepted |

150. Each Supervisory Defendant knew that a Supervisory Defendant, or a higher rank, was the only jailer the authority to move Tilson to a different cell.

151. It is apparent that Tilson did not eat the food he had been given in recent days by looking at the photographs of the garbage in his cell shown above.

152. Each Supervisory Defendant had the authority to provide a phone call to Tilson.

153. Each Supervisory Defendant had the authority to order Booking Deputies to provide water to Tilson on a regular schedule.

154. Each Supervisory Defendant had the authority to assign duties to Booking Deputies.

155. Each Supervisory Defendant had the authority to have Tilson transported to a hospital, absent any input or approval from CCS employees.

*Knowledge of Tilson's disparate treatment*

156. Shali Tilson was treated fundamentally differently from other inmates housed in the jail, and different than inmates who were placed on HC 11 or 12 for either purpose of suicide watch or punishment.

157. Shali Tilson was placed on suicide watch without any medical authorization. This action was contrary to policy and contrary to how other inmates in HC 11 and 12 were treated.

158. Shali Tilson was not allowed to shower, contrary to policy and contrary to other inmates housed in HC 11 and 12.

159.   Shali Tilson was not allowed a phone call, or recreation time, as required by policy for inmates housed in HC 11 and 12.

160.   Shali Tilson was not served certain meals even though policy required that those meals be offered to him.

161.   Shali Tilson was not provided adequate safety checks in spite of policy requiring those safety checks to be performed.

162.   Shali Tilson was not provided medical treatment in spite of an obvious medical need.

163.   Shali Tilson's screams and yells were ignored, whereas other inmates' requests for help were responded to.

164.   Shali Tilson's treatment was both cruel and unusual.

*The evening of Tilson's death*

165.   The last evening of Shali Tilson's life, the following Defendants were responsible for performing routine 15 minute checks to determine that Mr. Tilson was not harming himself: Sgt. Lang, Deputy Tolbert, and Deputy Shired.

166.   Tolbert, Shired, and Lang were not preoccupied with other work on the evening of Mr. Tilson's death. They were not occupied by other duties, and

each had ample time to perform all required suicide watch checks and had no basis whatsoever to ignore Mr. Tilson's cries for help.

167.    These Defendants did not perform the required 15 minute checks of Mr. Tilson.

168.    At approximately 4 p.m., Sgt. Lang and Deputy Tolbert inserted a Styrofoam tray into Mr. Tilson's cell which contained food. It did not contain water.

169.    Mr. Tilson was not given any water by any guard for the last three days of his life.

170.    At about 4:45 p.m., Mr. Tilson pushed the non-functioning emergency call button in his cell. He pushed on his emergency call button and sought help multiple times by calling to guards, motioning to them, and otherwise exhibiting a need for help.

171.    At about 5:00 p.m., Mr. Tilson sat against the wall of his cell, and positioned himself against the corner of the wall.

172.    Prior to losing consciousness, Mr. Tilson made repeated efforts to call to Tolbert, Lang, Shired, and any other guards who were near his door by using his emergency call button, yelling, and motioning to them.

173.   The following photo shows Mr. Tilson in his cell at 5:04 p.m

174.   At about 5:04 p.m., Mr. Tilson's head dropped forward, and he remained in that exact position until his death. *See* Exhibit 6.



*Exhibit 7: Tilson's position from 5:04 p.m. until he is discovered*

175.   At approximately 5:45 p.m., Sgt. Lang checked the suicide watch log and saw that it had not been signed since 3:00 p.m..

176.   Sgt. Lang did not actually check on Mr. Tilson at 5:45 p.m. when he signed the suicide log.

35

177.   Sgt. Lang falsified the suicide watch logs, and signed for suicide watch checks which did not occur.

178.   From 4 p.m. until 7:30 p.m., no person checked on Mr. Tilson.

179.   The first time anyone checked on Mr. Tilson after 4:00 p.m. was Sgt. Lang, who checked on Mr. Tilson at approximately 7:30 p.m.

180.   At 7:30 p.m., Sgt. Lang falsified the suicide watch logs and signed it to indicate that checks had been completed every 15 minutes since 5:45 p.m. In reality, the last check that occurred was at 4:00 p.m.

181.   At 7:30 p.m., Mr. Tilson was seated on the floor and leaning back against the wall with his head drooped forward. It was apparent that Mr. Tilson was not sleeping. Mr. Tilson was not otherwise moving, and was non-responsive.

182.   At the 7:30 p.m. check made by Sgt. Lang, he made no effort to determine whether Mr. Tilson was responsive in spite of it being obvious that Mr. Tilson was not.

183.   If Defendants Lang, Tolbert, or Shired had performed the suicide watch checks as required by Sheriff's office policy, they would have learned that

36

Mr. Tilson was non-responsive fifteen (or fewer) minutes after Mr. Tilson collapsed.

184. Defendants, and all guards working in booking, had a direct view into Mr. Tilson's cell via a live video feed. None of them checked it to see whether Mr. Tilson was moving or otherwise in medical distress.

185. Tolbert, Lang, and Shired knew it was uncommon for Mr. Tilson to be quiet, and the fact that Defendants did not hear Mr. Tilson make any noise between 5:04 p.m. and 8:25 p.m.—in spite of the fact that he had previously, repeatedly, been requesting help—created cause for concern which each Defendant ignored.

186. The next time anyone checked on Mr. Tilson was approximately 8:25 p.m.

187. At that time, Sgt. Lang noticed that Mr. Tilson appeared to be non-responsive, and told Deputy Tolbert to "glove up" in case Mr. Tilson was feigning a medical crisis.

188. While standing at the door way, Corporal Klein removed the cartridge from his Taser and cycled it. The purpose of doing so was to threaten Mr. Tilson.

189. Defendants Lang, Tolbert, and Shired were each in a position to check on Mr. Tilson and failed to do so.

190.  Had Tolbert, Shired, and Lang performed those checks as required by official policy, they would have noticed *at maximum* fifteen minutes later that Mr. Tilson was slumped against a wall of his cell with his head drooping over, and that he was non-responsive.

191.  If Mr. Tilson received emergency medical attention even hours after the time he lost consciousness, he could have easily been saved if he had received intravenous fluids and other medical aid.

192.  If medical aid had been summoned at any point on the day of his death, it would have been readily apparent to any medical practitioner that, based on Mr. Tilson's outward appearance alone, he was in a state of severe dehydration due to chapped lips, rapid breathing, rapid heart rate, and sunken skin.

*Allegations related to Captain Weathersby*

193.  Captain Weathersby was the Jail commander in the Rockdale County Jail.

194.  Captain Weathersby was the highest authority over Jail operations aside from Sheriff Levett.

195.  Sheriff Levett appointed Weathersby as Jail Commander.

196.   When she was appointed, Weathersby was unqualified for the job and had previously been a training supervisor for the Sheriff.

197.   Weathersby was not provided any training when she was appointed.

198.   There are at least two separate professional certifications for Jail Commanders. Weathersby has not obtained attended any training necessary to obtain those certifications.

199.   Weathersby was directly responsible for the failure of the Jail to preserve video of Tilson's cell from March 9 to the latter part of March 12.

200.   Weathersby did not review any of the video evidence that she had ben ordered to preserve after the IT worker she delegated the task to provided her with copies of the videos.

201.   Her failure to review the videos meant that the most vital evidence—and potentially the most damaging to her—was lost because the Jail's recording system overwrites recordings over 30 days old.

202.   Although Weathersby was delegated the task of collecting all videos of Tilson's time in the Jail within days of Tilson's death, the missing videos were not noticed until after 30 day had lapsed.

203.   Weathersby reviewed all uses of force reports, and watch video of each use of force, against Shali Tilson. This included six separate uses of force within two days of Tilson's arrival at the Jail.

204.   Weathersby knew there was no use of force against Tilson after March 6.

205.   Weathersby knew that Tilson was in Holding Cell 11.

206.   Weathersby knows about the same dereliction of duties described in this complaint whereby her subordinates falsified logs, neglected their duties.

207.   Weathersby believed that Tilson was in HC 11 because of his "erratic behavior."

208.   Weathersby knew Jailers were ignoring Tilson in spite of his constant screams.

209.   Weathersby knew Tilson was not allowed out of his cell from March 6 onward, and Weathersby's indifference grew each day.

210.   Weathersby knew that Tilson's cell was not cleaned.

211.   Weathersby knew that Tilson had not been allowed to shower.

212.   Weathersby knew that deputies regularly placed inmates in HC 11 and 12 as punishment for fighting, in spite of the fact that there are other solitary confinement cells available which running water, a toilet, and a bed.

213.   Weathersby knew her staff was indifferent to inmates' mental health.

214.   Weathersby and her subordinate jailers regarded suicide watch checks as being done exclusively to monitor whether the inmate was in physical danger.

215.   Jail staff, under Weathersby's command, and specifically those in booking who house inmates in confinement, routinely ignored inmates' psychiatric needs.

216.   Weathersby has previously disciplined booking commanders and watch commanders for failing to maintain inmate food logs, whereby supervisors failed to review whether inmates had been provided all meals.

217.   Weathersby knew the Jail had no hydration policy.

218.   Weathersby knew her subordinate jailers had no idea how much water a person needed to drink in a day.

219.   Weathersby knew that no one was specifically assigned to provide inmates water, and that there was no mechanism for tracking how much water inmates in HC 11 or 12 are given.

*Lang's disciplinary history*

220.   In addition, Weathersby knew of specific dereliction of duties by Sgt. Lang.

221.   Specifically, For example, in January 2018 an internal audit showed that

Sgt. Lang, then the supervisor of the property and evidence room, was

found to have failed to destroy firearms as required.

222.   An internal investigation showed that Sgt. Lang kept no records of actual

firearm destruction from 2013 through 2017. Sgt. Lang also failed to follow

numerous required procedures to document firearms stored in the property

room.

223.   During the January 2018 audit, it was revealed that many property and

evidence bags were torn open; guns were in incorrect locations; firearms

from felony cases were sold within a few years of the date of the crime;

narcotics bags had incorrect case and identification numbers; narcotics were

missing in spite of no destruction being authorized; narcotics bags were

leaking and the smell was overwhelming; there was only one Narcan in the

property and evidence unit in spite of the requirement that multiple units be

available in each staff member's vehicle. These are only a portion of the

number of violations of policy perpetrated by Sgt. Lang while he worked in the property and evidence room.

224.   Sgt. Lang had previously been warned—in 2017—by supervisory officials that his disregard of property room procedures was unacceptable. These procedures include failing to document firearms, and retaining recovered ammunition for use by agency personnel.

225.   The Sheriff personally knew of each of these allegations because the findings were reported directly to him.

226.   After learning of Lang's wanton disregard for policies as the property and evidence supervisor, the Sheriff reassigned him to be a *supervisor* in the booking area of the Jail.

227.   In December 2017, Sgt. Lang received a score of 29/50 on a performance evaluation. A score of 28 or lower requires it to be forwarded to the Sheriff. This evaluation was known to the Sheriff and was part of Lang's personnel file.

228.   In May 2017, Sgt. Lang took paid time off without notifying either of his direct supervisors, resulting in disciplinary action. The Sheriff knew of this discipline and disregard of duties.

229.   Lang held this position through the date of Mr. Tilson's death.

230.   During that time, in spite of knowing that Sgt. Lang had made a mockery of his duties in the property and evidence room—and believing that some of Sgt. Lang's conduct was criminal—Lang was charged with overseeing inmates on suicide watch and in solitary confinement, and to oversee others who did the same.

231.   In September 2018, Sgt. Lang was arrested and charged with theft by taking firearms, theft of $40,000, and violation of oath of office.

*Causation and Damages*

232.   The actions of each Defendant caused Mr. Tilson to endure violations of his constitutional and statutory rights prior to his death. This resulted in needless mental and physical pain and suffering prior to his death.

233.   Mr. Tilson died of a pulmonary embolism caused by dehydration. In other words, his blood became so viscous from the lack of water that it formed clots, and those clots then traveled to his lungs and he suffocated to death.

234.   If Mr. Tilson had been referred to a physician during his incarceration, every competent physician would have referred him to a psychiatric hospital or

provided prescription medication and continued monitoring. If this had occurred, Mr. Tilson would not have died.

235. If Mr. Tilson had been provided adequate drinking water during his time in the jail, he would not have died.

236. Mr. Tilson suffered physical and mental pain and suffering before his death resulting from the conditions of his confinement, the denial of water, and denial of medical care.

237. Mr. Tilson's estate is entitled to recover damages for pre-death pain and suffering caused by each Defendant.

238. The actions of each Defendant in this case were the proximate cause of Mr. Tilson's death.

239. Mr. Wilson's parents are entitled to recover the full value of Mr. Tilson's life from each Defendant.

<u>COUNT I</u>

240. Plaintiffs contend that the conditions of Tilson's confinement violate the Fourteenth Amendment.

241. This Count is alleged against all Captain Weathersby and all Supervisory Defendants.

242.   As an objective matter, the conditions of Tilson's cell were unconstitutional.

243.   In this county, a pretrial detainee—who is presumed innocent—cannot be locked in a small room, naked, with inadequate water, no toilet paper, no toilet, no shower, and no contact permitted with the outside world, with the lights on 24 hours a day, for six days continuously. It is inhumane and cruel.

244.   As it relates to Weathersby, Plaintiffs contend that she was deliberately indifferent for the reasons set forth, supra, describing Weathersby's personal knowledge. Weathersby's reaction to her knowledge constitutes deliberate indifference to the existence of those conditions.

245.   As it relates to the Supervisory Defendants, each Defendant had the authority to rectify Tilson's housing conditions by moving him into a normal clean segregation cell, allowing him to shower, cleaning his cell, or taking any of a number of other steps to ameliorate the conditions.

246.   These conditions of confinement caused Shali Tilson pain and suffering during his life.

247.   These conditions of confinement were the proximate cause of Shali Tilson's death.

## COUNT II

248.   Plaintiffs contend that the conditions of Tilson's confinement constitutes the imposition of punishment upon a pretrial detainee in violation of the Fourteenth Amendment.

249.   This Count is alleged against all Captain Weathersby and all Supervisory Defendants and Plaintiffs allege that each acted out of a desire to punish Tilson, and Weathersby sanctions and approved of her subordinates' use of HC 11 as punishment and failed to supervise and train them as needed.

250.   As set forth in the allegations detailing their personal knowledge, each of the Supervisory Defendants regarded Tilson's 24-hour confinement being justified because of Tilson's erratic behavior.

251.   The conditions of his confinement go far beyond those necessary to maintain order in the Jail.

252.   Defendants imposed and maintained Tilson's 24-hour confinement in an act of retribution, and were motivated by the intent to punish him.

253.   Weathersby regarded these actions as legitimate and common practice, and allowed the practice to continue in spite of her knowledge generally and in spite of her knowledge specifically as it relates to Shali Tilson.

47

254. The conditions of confinement resulting from the unlawful punishment of Shali Tilson violate the Fourteenth Amendment and were the cause of pain and suffering during his life, and were the proximate cause of his death.

<u>COUNT III</u>

255. Plaintiffs contend that the failure to provide Tilson adequate water independently violated the Fourteenth Amendment, irrespective of the other conditions of his confinement.

256. This Count is alleged against Captain Weathersby and the Supervisory Defendants.

257. As stated, on March 6, 7, and 8, Jail staff evidence a clear pattern of failing to supply adequate water to Tilson. During those three days, Tilson received —at most—56 ounces of water. (If the cups were half-full, then 28 ounces.) The supervisors were those days are all Defendants here.

258. Those supervisors continued the same treatment through the weekend.

259. As set forth the Supervisory Defendants were aware of their own failures to follow policy, and were aware of the failures of their co-workers and colleagues.

260. As set forth, the Supervisory Defendants knew that Tilson was throwing water, refusing water, and that jailers were retaliating against Tilson by denying him water.

261. It is unconstitutional to hold a pretrial detainee in a locked room for 6 days with no source of water and to withhold water.

262. As to Weathersby, she was deliberately indifferent to the serious risk to Tilson's health given her knowledge of the length of time he was in HC 11, the complete lack of training regarding providing hydration, the routine dereliction of duties of her subordinates, and the retaliatory and punitive practices of jail staff.

<u>COUNT IV</u>

263. Plaintiffs content that the failure to summon medical help for Tilson violated the Fourteenth Amendment due to deliberate indifference to his psychiatric needs.

264. This count is alleged against the Supervisory Defendants and Weathersby.

265. As it relates to the Supervisory Defendants, Plaintiffs content that each of them had sufficient knowledge to determine that: (a) Tilson was in a dire psychiatric crisis and needed a doctor's attention; (b) that any mental health

review or assessment by CCS staff was grossly inadequate; (c) that CCS had no plan whatsoever for what to do with Tilson, even 6 days after he had been placed in HC 11; (d) that Tilson's psychiatric state was becoming worse; (e) that Tilson's conditions of confinement were worsening his psychiatric condition; and, (f) that no doctor had seen Tilson.

266.   Plaintiff charges each individual Supervisory Defendant with the knowledge that can be inferred from the work schedule setting forth when those Defendants would have been in contact with Tilson.

267.   As it relates to Patterson, she saw Tilson on March 7, 8, 9, 10, and 12. She knew of his mental conditions on March 7, and she knew it worsened and there was no plan to help him.

268.   Bogardts oversaw Tilson March 7, 8, 9, and 12. He had the same knowledge as Patterson, and had closer personal contact with Tilson.

269.   Lang oversaw Tilson as Booking Commander on March 7 and 12. Again, he knew the same information.

270.   The timing of the other Defendants can be determined by the above-referenced schedule. Each Supervisory Defendant's knowledge will be

different but Plaintiffs contend that each knew the material facts necessary to establish deliberate indifference to his medical needs.

271. Summoning medical help for Tilson would have saved him, and Defendants' indifference is the proximate cause of Tilson's death.

## COUNT V

272. This count is alleged against Sheriff Levett in his official capacity for violating the Americans with Disabilities Act and the Rehabilitation Act.

273. Plaintiffs contend that supervisory officials within the Sheriff's Office acted with deliberate indifference to hostile and pervasive discrimination against Shali Tilson by supervisors and other jail staff.

274. Every Defendant ranked sergeant or above had the ability to ameliorate the discriminatory conditions of Tilson's confinement and to discipline those who engaged in the discriminatory acts.

275. The discriminatory acts are reflected in the paragraphs above which detail the ways in which Shali Tilson's treatment was fundamentally different that the treatment afforded to other individuals at the Jail.

276. Shali Tilson suffered from schizophrenia. He was arrested while in a state of psychosis and arrived at the Jail in that state.

277. Each jailer who interacted with Tilson regarded him as being disassociated, paranoid, delusional, or otherwise disconnected from reality for an extended period of time.

278. Shali Tilson's treatment at the Jail was because of his disability—schizophrenia—and the jailer's reactions to it.

279. The Sheriff's Office is a public entities under 42 U.S.C. § 12131(1).

280. As recipients of federal funds, the Sheriff is required by Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794) to make reasonable accommodations to persons with disabilities in their facilities, program activities and who receive their services. Such recipients are further required to modify such facilities, services, and programs as necessary to accomplish this purpose. Accordingly, these Defendants are subject to the mandate of Section 504.

281. Mr. Tilson was disabled within the meaning of the ADA, 42 U.S.C. § 12131(2), because he had a mental impairment that substantially limited one or more of his major life activities.

282. Mr. Tilson was regarded as being disabled by jail staff and each Defendant who interacted with him.

283. As detailed in the factual allegations above, both the Defendants involved in Tilson's confinement and care acted with discriminatory animus resulting from the fact that Mr. Tilson was mentally ill and psychotic.

284. Specifically, these individuals acted with discriminatory animus by placing Mr. Tilson on "suicide watch" simply as a result of Mr. Tilson's severe mental illness, and as a way to segregate him from the rest of the inmates while simultaneously denying him access to the outside mental health services he obviously needed.

285. After his initial placement, supervisors employed by the Sheriff's Office continued to discriminate against Tilson by subjecting him to ongoing unnecessary and inhumane conditions of confinement.

286. Tilson was treated fundamentally differently than this counterparts at the jail, even those who have been housed in HC 11 and 12, because he was not allowed out of his cell, denied basic sanitation, adequate water, and was neglected.

287. The reason for this treatment is that Tilson was mentally ill, and therefore regarded as a problem to simply be locked away and ignored.

288.  To whatever extent Mr. Tilson qualified to be placed on suicide watch, he
      should have been provided accommodations to the jail's solitary
      confinement policies, and such accommodations could have been provided
      without constituting a substantial alteration in the jail's services. For
      example, Mr. Tilson should have been transferred to a psychiatric hospital
      rather than a held in solitary confinement in the same way a mentally
      healthy inmate would have been transferred to a hospital for a physical
      illness.

289.  Mr. Tilson should have been provided the basic necessities of life, such as
      food, water, and basic sanitation, which were provided to other inmates but
      denied to him, and was denied those provisions due to discrimination
      against him based upon his disability.

290.  Those individuals who decided Mr. Tilson's conditions of confinement acted
      with discriminatory animus based upon Mr. Tilson's mental disability, and
      their decision was based upon negative associations, biases, and prejudices
      against individuals with extreme mental illness.

291.  Each individual who determined Mr. Tilson's confinement, placement on
      suicide watch, denied him access to medical care, and denied him access to

water acted in their capacity as a representative of the Sheriff. These individuals acted within the authority granted to them, and each had the authority to seek medical care for Mr. Tilson, provide water to Mr. Tilson, or change Mr. Tilson's housing conditions.

292. The individuals who placed Mr. Tilson in solitary confinement had the discretion to provide an accommodation to the jail's practice of housing individuals with severe mental illness in segregation, and could have provided an accommodation for Mr. Tilson given his particular vulnerability to being housed in isolation.

293. The Supervisory Defendants all acted with deliberate indifference, or actively participated, in the discrimination against Tilson.

294. The discriminatory treatment is the proximate cause of Tilson's death, and cased Tilson pain and suffering during his life.

<u>COUNT VI</u>

295. This Count is alleged under Georgia law against Defendants Tolbert, Lang, and Shired for their failure to perform ministerial duties.

296.  The duties described above, whereby these Defendants failed to perform health and safety checks on Mr. Tilson on the evening of his death, constitute ministerial duties.

297.  These Defendants negligently breached those duties by failing to perform the mandatory health and safety checks.

298.  As set forth above, Mr. Tilson would have survived had medical assistance been summoned before he stopped breathing.

299.  To the extent that these duties are not ministerial duties, these Defendants acted with malice, i.e., the deliberate intent to do wrong, when they failed to check on Mr. Tilson given that they knew he was in need of medical assistance, and that he was attempting to communicate with them. Additionally, these Defendants falsified suicide watch logs indicating that they verified that Mr. Tilson was in stable and healthy condition in spite of the fact they did not perform those checks.

300.  If Tolbert, Lang, and Shired had performed the ministerial duty of performing suicide watch checks, Tilson would not have died.

<u>Count VII</u>

301.    This count is alleged against Sheriff Levett in his individual capacity under a theory of deliberate indifference, failure to train, and establishment of an unconstitutional policy and practice under 42 U.S.C. § 1983 and the Fourteenth Amendment as it relates to the use of Holding Cell 11 as a means of punishment.

302.    Sheriff Levett knew that Weathersby was grossly unqualified for her position.

303.    Sheriff Levett knew that Sgt. Lang was grossly unqualified for his position and engaged in fraud and theft while supervising the property room. Sheriff Levett was fully briefed and had full knowledge of the facts laid out here regarding Lang's conduct and other facts concerning his unfitness for duty.

304.    Sheriff Levett's official jail policy allowed deputies to use HC 11 and 12 to punish inmates for violating rules, where those punishments greatly exceeded any need for institutional security and were carried out for the purpose of retribution against unconvicted pretrial detainees.

305.    Sheriff Levett knew there were no policies whatsoever governing the provision of fluids to inmates in HC 11 and 12.

306.   Sheriff Levett knew that inmates remained in HC 11 and 12 typically, for 2
to 3 days.

307.   Sheriff Levett had personal knowledge of the operation of the Jail, and his
own policies, would lead to the punishment of inmates, the use of solitary
confinement for that punishment.

<u>Count VIII</u>

308.   Plaintiffs seek attorney's fees against Defendants Lang, Tolbert, and Shired
under O.C.G.A. § 13-6-11 as Defendants have acted in bad faith, been
stubbornly litigious, or caused Plaintiffs unnecessary trouble and expense.

309.   Plaintiffs also seek attorney's fees under 42 U.S.C. § 1988(b), 42 U.S.C. §
12205, and 29 U.S.C. § 794a(b) for their causes of action under 42 U.S.C. §
1983, the Americans with Disabilities Act, and the Rehabilitation Act.

*Request for Relief*

310.   Assume jurisdiction over this action;

311.   Hold a trial by jury on all issues so triable;

312.   Award general, nominal, and special damages to Mr. Tilson's estate for
damages incurred before his death in an amount determined by a jury;

313.   Award general, nominal, and special damages to Ms. Tilson and Mr. Joseph

for the value of Mr. Tilson's life in an amount determined by a jury;

314.   Award punitive damages against each Defendant who has been sued in their

individual capacity;

315.   Award reasonable attorney's fees, expenses, and costs of litigation;

316.   Award such other and further relief to which Plaintiff is legally entitled,

whether explicitly pleaded or not, to which Plaintiff is entitled.

Submitted January 30, 2020.

**Mawuli M. Davis**
Georgia Bar No. 212029

**Harold W. Spence**
Georgia Bar No. 671150
THE DAVIS BOZEMAN LAW FIRM, P.C.
4153-C Flat Shoals Parkway, Suite 332
Decatur, Georgia 30034
404.244.2004
mdavis@davisbozemanlaw.com
hspence@davisbozemanlaw.com

**Jeffrey R. Filipovits**
Georgia Bar No. 825553
FILIPOVITS LAW, P.C.
2900 Chamblee-Tucker Road
Building 1
Atlanta, Georgia 30341
678.237.9302
jeff@law.filipovits.com

59

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Times New Roman 14-point typeface.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record: Taylor Hensel, Terry Williams, Jason Waymire, and Timothy Buckley.

Submitted January 30, 2020.

**Jeffrey R. Filipovits**
Georgia Bar No. 825553
Filipovits Law, PC
2900 Chamblee-Tucker Road, Bldg. 1
Atlanta, Georgia 30341
678.237.9302
jeff@law.filipovits.com