## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

THE ESTATE OF SHALI
      TILSON, *et al*., Plaintiffs,

vs.

ROCKDALE COUNTY, GEORGIA,
    *et al*.,    Defendants.

CIVIL ACTION FILE NO.

1:19-cv-01353-JPB

## SHERIFF LEVETT'S BRIEF IN SUPPORT OF HIS MOTION FOR JUDGMENT ON THE PLEADINGS

COMES NOW SHERIFF ERIC LEVETT in the above-styled action, and, pursuant to Rule 12 (c) of the Federal Rules of Civil Procedure, files this Brief in Support of his Motion for Judgment on the Pleadings, as follows:

## INTRODUCTION

This is a wrongful death case arising under § 1983 and the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA), based on an inmate's death in the Rockdale County Jail. The operative complaint (hereafter the "complaint") recognizes that the Decedent died while on "suicide watch," part of which involved being in a padded cell by himself with nothing that could be used for self-harm.[1] See Doc. 65 at ¶¶56, 166. In substance, the complaint alleges that the Decedent was psychotic while being housed under suicide watch, and that he died as a result of dehydration.[2]  Doc. 65 at ¶¶233, 283.

---

[1]    The complaint calls this "solitary confinement," which is a gross mischaracterization of suicide prevention precautions.

[2]    Where the substance of the Plaintiff's additional allegations matter, they are summarized below in connection with specific arguments.

In a separate lawsuit, Plaintiffs also sued the contracted medical provider (Wellpath, LLC, f/k/a Correct Care Solutions (CCS)) and its health personnel in DeKalb State Court. Exhibit 1 – <u>Tilson, *et al*. v. Wellpath, LLC, *et al*</u>, DeKalb State Court case No. 20A79577 (filed March 10, 2020).[3] In that action, Plaintiffs claim that Wellpath and its employees committed medical malpractice in various respects, thereby improperly managing the Decedent's mental and physical health and ultimately causing his death. Exhibit 1 at ¶¶125-137. In contradiction to the complaint in this case, Plaintiffs' DeKalb lawsuit explains that Tilson had consistent medical evaluation throughout his incarceration.

Plaintiffs sue Rockdale County Sheriff Eric Levett, and numerous Sheriff's deputies. Sheriff Levett is sued individually and in his official capacity, primarily based on policies. In support of this motion, Sheriff Levett files relevant policies, which the Court can review to make a proper ruling.[4]

For the reasons discussed herein, Sheriff Levett is entitled to dismissal.

## <u>ARGUMENT AND CITATIONS TO AUTHORITY</u>

Sheriff Levett is entitled to qualified immunity against Plaintiff's § 1983

---

[3] "Courts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage." <u>U.S. ex rel. Osheroff v. Humana Inc.</u>, 776 F.3d 805, 812 n. 4 (11th Cir. 2015) (Fed.R.Evid. 201; <u>Lozman v. City of Riviera Beach</u>, 713 F.3d 1066, 1075 n. 9 (11th Cir. 2013)).

[4] Plaintiffs refer to Sheriff's Office policies "in [their] complaint, the [policies are] central to [the] claim, [policy] contents are not in dispute, and the defendant attache[s] the [policies] to [the] motion to dismiss." <u>Fin. Sec. Assur., Inc. v. Stephens, Inc.</u>, 500 F.3d 1276, 1284 (11th Cir. 2007) (citing <u>Harris v. Ivax Corp.</u>, 182 F.3d 799, 802 n. 2 (11th Cir.1999); <u>Brooks v. Blue Cross & Blue Shield of Fla., Inc.</u>, 116 F.3d 1364, 1368 (11th Cir. 1997)).

supervisor claim, and the Eleventh Amendment bars claims against the Sheriff's Office. Additionally, Plaintiffs' Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) claims should be dismissed for failure to state a claim.

## I.     QUALIFIED IMMUNITY BARS PLAINTIFF'S FEDERAL CLAIM AGAINST SHERIFF LEVETT

According to the operative complaint, Plaintiff sues Sheriff Levett under § 1983 as a supervisor for appointing certain officers to jail positions and for alleged policies. Doc. 65 at Count 7.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).  There should be no question that Sheriff Levett acted within his discretionary duties with regard to policymaking, which is the sole basis for the claim against him.[5]  Therefore, "the burden of persuasion [to defeat qualified immunity] is on the Plaintiff." Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997).

Plaintiffs sue Sheriff Levett under § 1983 solely as a policymaker. For supervisor liability, there must be an underlying constitutional violation. Gish v.

---

[5]   See Doc. 19 at ¶¶54, 139-140, 160; Harvey v. Nichols, 260 Ga.App. 187, 191, 581 S.E.2d 272, 276-77 (2003); Lowe v. Jones County, 231 Ga.App. 372, 373 (3), 499 S.E.2d 348 (1998); Bontwell v. Department of Corrections, 226 Ga.App. 524, 486 S.E.2d 917 (1997) (level of supervision and training provided to subordinate officers is discretionary function); see also Harbert Intern., Inc. v. James, 157 F.3d at 1283  (looking to state law to determine whether the relevant function is within officer's discretionary authority).

Thomas, 516 F.3d 952, 955 (11th Cir.2008) (affirming summary judgment for sheriff in jail case on the ground that no constitutional violation was shown). Defendant submits that the complaint fails to state a claim that any Defendant committed a constitutional violation, which likely will be briefed by co-Defendants. For that reason the claims against Sheriff Levett should be dismissed. Aside from that fatal problem, as discussed below, the complaint does not allege facts sufficient to support a supervisor liability claim.

## A.  The Complaint Fails to State a § 1983 Supervisor Liability Claim

Unlike prior complaints, in the latest complaint Plaintiffs claim that Sheriff Levett is liable for appointing Defendants Weathersby and Lang to jail positions for which they were unqualified. Doc. 65 at ¶¶302-303. Additionally, the complaint says Sheriff Levett can be liable based on jail policies. Each meritless claim is considered in turn.

### 1.  Sheriff Levett Cannot Be Liable for Appointing Allegedly Unqualified Officers[6]

Sheriff Levett cannot be liable under § 1983 for appointing Defendants Weathersby and Lang to jail positions. "The test for establishing supervisory liability based on a hiring decision is … "deliberate indifference," or that the hiring official "disregarded a known or obvious consequence" of his or her hiring decision." McDaniel v. Yearwood, No. 2:11-CV-00165-RWS, 2012 WL 526078, at *17 (N.D. Ga. 2012) (quoting Bd. of Cnty. Commsrs. v. Brown, 520 U.S. 397,

---

[6]    Sheriff Levett is not suggesting that any officer was objectively unqualified, but considers the argument because that is a claimed basis for liability.

410, 117 S.Ct. 1382 (1997)).

> To hold a [supervisor] liable under Section 1983 based on an "isolated decision to hire an officer without adequate screening," a plaintiff must demonstrate "that the decision reflected a conscious disregard for a high risk that the officer would [inflict injury] in violation of [the plaintiff's] federally protected right." Bd. of County Comm'rs v. Brown, 520 U.S. 397, 415-16 (1997). Moreover, the plaintiff must show the offending "officer was highly likely to inflict the particular injury suffered by the plaintiff," as well as a strong "connection between the background of the particular applicant and the specific constitutional violation alleged." Id. at 412.

Williams v. City of Atlanta, No. 1:15-CV-02679-RWS, 2016 WL 1242087, at *5 (N.D. Ga. 2016) (internal alterations removed).

Plaintiffs have to allege facts that would allow the Court to infer how Defendants Lang and Weathersby were unqualified, whether that lack of qualification was evident at the time of appointment to jail positions, and how that lack of qualification was "highly likely" to inflict death on Mr. Tilson. *Id.* There are no such allegations.

### a. Defendant Weathersby

Sheriff Levett appointed Defendant Weathersby as the jail administrator. There is no allegation that Defendant Weathersby had any personal role in Tilson's incarceration or death. Nor do the Plaintiffs acknowledge that Weathersby served as the *assistant* jail administrator from 2013 until her eventual promotion. Doc. 80 at ¶196; *Colardo-Keen v. Rockdale County, et al.*, Case 1:14-cv-00489-MHC, Doc. 212 (July 8, 2015 deposition testimony by Defendant Weathersby) at 17 ("I am the assistant jail administrator."). Weathersby was far from unqualified in March 2018.

The complaint says that Weathersby did not get additional training or a special certification after her appointment. Doc. 65 at ¶¶197-198. These allegations do not approach a demonstration of lack of qualification. Nor does the complaint allege that Defendant Weathersby had any material role in Tilson's death, or that Weathersby's background made it "highly likely [she would] inflict the particular injury" suffered here. See Bd. of County Comm'rs v. Brown, 520 U.S. 397, 412 (1997). Accordingly, Sheriff Levett's appointment of Defendant Weathersby provides no basis for § 1983 liability.

### b. Defendant Lang

Defendant Lang was assigned to the jail after serving in the property and evidence division. Doc. 65 at ¶226. According to the complaint, Lang's transfer to the jail occurred after Lang's removal for mishandling evidence, poor documentation, a low performance review and taking paid time off without notifying superiors. Doc. 65 at ¶¶221-228.

None of the foregoing transgressions would tell a reasonable Sheriff that Defendant Lang was "highly likely" to commit intentional violations of an inmate's rights, thereby leading to death from complications of dehydration. See Doc. 65 at ¶233. There is absolutely no "connection between [Lang's alleged] background ... and the specific constitutional violation alleged." See Bd. of County Comm'rs v. Brown, 520 U.S. 397, 412 (1997). The current complaint provides no basis to connect Sheriff Levett to Tilson's death by way of appointment of Defendant Lang to a jail position.

### 2.   Sheriff Levett Cannot Be Liable for Jail Policies

A supervisor has no federal duty to adopt or change policy, absent clear notice to the supervisor that some remedy is constitutionally mandated. For this type of claim, Plaintiffs are required to allege (1) actual prior constitutional deprivations connected to an acknowledged policy or practice, that were (2) actually brought to the attention of Sheriff Levett with sufficient detail to reveal unconstitutional conduct, and (3) which were "obvious, flagrant, rampant, and of continued duration." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990) (emphasis supplied); **Piazza v. Jefferson Cty., Alabama**, 923 F.3d 947, 957-958 (11th Cir. 2019).  The operative complaint has no such allegations.

Instead, the complaint alleges "official jail policy allowed deputies to use HC 11 and 12 to punish inmates for violating rules," "there were no policies whatsoever governing the provision of fluids to inmates in HC 11 and 12," and Sheriff Levett "had personal knowledge of the operation of the Jail, and his own policies, would lead to the punishment of inmates, the use of solitary confinement for that punishment." Doc. 65 at ¶¶304-307.  These contentions fail to state a claim for at least four reasons.

First, Sheriff Levett has filed official jail policies with this motion. Exhibit 2. None of them support Plaintiffs' allegations. Also, it should go without saying that Plaintiffs' allegations about the content of a policy are not entitled to any consideration in the absence of discrete factual allegations that support the

existence of such a policy.[7]

Second, case law says that an inmate at risk for suicide can be housed in a padded cell without items that could be used for self harm. In O'Connor v. Kelley, 644 F. App'x 928 (11th Cir. 2016), the Eleventh Circuit found no Eighth Amendment violation where a prisoner was held in the same type of cell as the Decedent, and the prisoner also complained about excessive cold. *Id*. at 930. Likewise, in McMahon v. Beard, 583 F.2d 172 (5th Cir.1978), the court found no constitutional violation when a pretrial detainee who attempted suicide was placed in a "strip cell" in "solitary confinement" for 90 days without clothing, a mattress, sheets, or blankets. *Id*. at 175; see also Newman v. State of Ala., 559 F.2d 283, 291 (5th Cir. 1977), *rev'd in part on other ground*, Alabama v. Pugh, 438 U.S. 781, 98 S. Ct. 3057 (1978) ("If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety … that ends its obligations under Amendment Eighth Amendment."). These cases dispose of any claim that Sheriff Levett can be liable based on Tilson's confinement for roughly six days in a padded cell on suicide watch.

Third, no well-pleaded factual contention supports an inference that any officer intended to "punish" Tilson. And, even if some officer had that subjective

---

[7] "Plaintiff[s'] contentions regarding the [Sheriff's] policy and practices are couched in conclusory, formulaic terms, [and] the Court is not bound to accept these allegations as a valid basis for stating a claim supporting ... liability." Purvis v. City of Atlanta, 142 F. Supp. 3d 1337, 1343 (N.D. Ga. 2015) (citing Oxford Asset Mgmt. v. Jaharis, 297 F.3d 1182, 1187–88 (11th Cir.2002) (stating that "conclusory allegations, unwarranted deductions of facts[,] or legal conclusions masquerading as facts will not prevent dismissal")).

intent, there is no basis to believe that such intent was known to or approved by Sheriff Levett. See Piazza, 923 F.3d at 958 (finding that sheriff had no liability under supervisor liability standards for jail officers use of force and alleged deliberate indifference to proper medical care).

Fourth, the complaint lacks any allegation that Sheriff Levett knew that a policy or practice caused a pattern of constitutional violations that were "obvious, flagrant, rampant, and of continued duration." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990) (emphasis supplied).  Where only a single incident underlies the supervisor liability claim, it fails as a matter of law. **Piazza** , 923 F.3d at 958. That is the case here.  The complaint fails to state a viable claim against Sheriff Levett, who is entitled to dismissal.

### B.  Sheriff Levett Did Not Violate Clearly Established Law

Plaintiffs bear the burden to show that "it would be clear to [Sheriff Levett] that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156 (2001) (emphasis supplied). This requires proof that "existing precedent … placed the statutory or constitutional question beyond debate." Reichle v. Howards, 132 S.Ct. 2088, 2089 (2012) (emphasis supplied).  It appears that no such precedent exists, and in fact binding precedent supports Sheriff Levett. Piazza, 923 F.3d at 958.

The Eleventh Circuit has indicated that qualified immunity is almost *always* appropriate for jail officials sued for supposedly illegal conditions of confinement.

Jordan v. Doe, 38 F.3d 1559, 1567 (11th Cir.1994).[8] And as noted above, nothing about Sheriff Levett's hiring decisions, policies, Tilson's confinement or the jail's track record add up to a basis for supervisor liability.

In regard to provision of water, there is no allegation that anyone intentionally withheld water from Tilson, much less under a *policy* requiring withholding water. Instead, the complaint alleges that Sheriff Levett "knew there were no policies whatsoever governing the provision of fluids to inmates in HC 11 and 12." Doc. 65 at ¶305. This is merely an allegation about *lack of a policy*, which is insufficient to ground supervisor liability in the absence of prior constitutional violations that were "obvious, flagrant, rampant, and of continued duration." Brown, 906 F.2d at 671; Piazza, 923 F.3d at 958.

The upshot is that Sheriff Levett is entitled to qualified immunity because the complaint alleges no more than practices (or the absence of a policy) that the Plaintiffs allege are deficient in some manner, but which (even if proven) have not been ruled clearly unconstitutional and never caused any previous constitutional violation(s). The operative complaint does not state a violation of clearly established federal law by Sheriff Levett, who is entitled to qualified immunity. See Cottone v. Jenne, 326 F.3d 1352, 1362 (11th Cir. 2003) (granting motion to dismiss by supervisor officers on § 1983 claims).

---

[8]   *See also* Wilson v. Blankenship, 163 F.3d 1284, 1294 (11th Cir.1998) ("Applying the Bell [v. Wolfish] standard to confinement conditions … is "exceedingly difficult and does not provide clear results," which makes qualified immunity appropriate." quoting Hamm v. DeKalb County, 774 F.2d at 1573.).

## II. PLAINTIFFS' OFFICIAL CAPACITY CLAIM AGAINST SHERIFF LEVETT FAILS

Count 5 of the operative complaint raises a claim under the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA), asserting disability discrimination by jail officers. Doc. 65 at 57. Plaintiffs' claims against Sheriff Levett in his official capacity fail (1) based on Eleventh Amendment immunity; and (2) for failure to state a viable claim.

### A. Eleventh Amendment Immunity Bars Plaintiffs' ADA Claim

In the wake of <u>Manders v. Lee</u>, 338 F.3d 1304, 1328 (11th Cir. 2003) (*en banc*), the Eleventh Circuit routinely finds that a Georgia sheriff in his official capacity is entitled to Eleventh Amendment immunity for most law enforcement functions. For example, in <u>Purcell ex rel. Estate of Morgan v. Toombs County, Ga.</u>, 400 F.3d 1313 (11th Cir.2005), the Eleventh Circuit held that conditions of confinement at a jail are encompassed within the Sheriff's role as a state actor:

> [The Sheriff] functions as an arm of the State—not of [the] County—when promulgating policies and procedures governing conditions of confinement at the … County Jail. Accordingly, even if [the plaintiff] had established a constitutional violation, [the Sheriff] would be entitled to Eleventh Amendment immunity from suit in his official capacity.

<u>Purcell</u>, 400 F.3d at 1325; <u>see also</u> <u>Powell v. Barrett</u>, 496 F.3d 1288, 1305-1308 (11th Cir.2007). <u>Manders</u> and its progeny indicate that the Sheriff's Office operates the Jail on behalf of the State. <u>Manders</u>, 338 F.3d at 1315. Consequently, Sheriff Levett was a state actor in regard to the Decedent's conditions of confinement.

The same is true for inmate medical care. In <u>Lake v. Skelton</u>, 840 F.3d 1334

(11th Cir. 2016), the Eleventh Circuit implied that inmate medical care is a function carried out by the Sheriff for the State. See also Bd. of Comm'rs of Spalding County v. Stewart, 284 Ga. 573, 574-75, 668 S.E.2d 644, 645 (2008) (holding that Georgia law commits inmate medical care to the sheriff, and the County cannot control the sheriff's choice in contracting with medical care providers); Palmer v. Correct Care Solutions, LLC, 291 F.Supp.3d 1357 (M.D. Ga. 2018) (following Lake and holding that Eleventh Amendment immunity bars inmate medical claim against Sheriff's Office). Simply put, a Georgia sheriff is a State actor when providing medical care to inmates in the jail. Consequently, the Eleventh Amendment poses a bar to any "official capacity" claim raised in this action.

### B.  The Eleventh Amendment Bars Plaintiffs' ADA Claim

As noted above, Count 5 raises a claim under the Americans with Disabilities Act (ADA). Doc. 65 at Count 5. The Eleventh Amendment bars ADA claims, except to the extent that an ADA violation *also* amounts to a violation of a right guaranteed under the Fourteenth Amendment. See United States v. Georgia, 546 U.S. 151, 126 S.Ct. 877 (2006).

The complaint does not allege a violation of any Fourteenth Amendment right that also is an ADA violation. The allegations are that Tilson should not have been placed on suicide watch, he was denied medical care,[9] his conditions of

---

[9] As the Plaintiffs' DeKalb County lawsuit reveals, there is no basis for their contentions that Tilson was denied medical care. Plaintiffs simply quibble with the quality of care. Also, inadequate medical care is not a basis for a Title II ADA claim. See § II(C)(1) below.

confinement were improper, and officers over roughly 18 8-hour shifts did not pay attention to how much water Tilson was obtaining, consuming and/or discarding. See Doc. 65 at ¶109 ("Tilson regularly dumped water, refused water, or threw water back at jailers… .").[10] As discussed elsewhere, those contentions do not add up to any viable constitutional claim. See §§ I(A)(2), (B) & II(C), *herein* (explaining that conditions of confinement, etc. do not state a constitutional claim); Redding v. Georgia, 557 F. App'x 840, 845 (11th Cir. 2014) (dismissing ADA claim under the Eleventh Amendment, where inmate claimed he was not given a bottom bunk). Consequently, the Eleventh Amendment bars Plaintiffs' claims under the ADA.

### C.  Plaintiffs Fail to State a Valid ADA and RA Claim

Plaintiffs' claim under the ADA and Rehabilitation Act is that the Decedent should *not* have been placed under standard suicide watch procedures, that some different medical care should have been provided, that the multiple jail officers did not pay sufficient attention to whether Tilson consumed enough water, and his conditions of confinement were improper.  Doc. 65 at Count 5.

The elements of a *prima facie* case under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA) are identical in most respects. See Bircoll v. Miami-Dade County, 480 F.3d 1072, 1088 n.12 (11th Cir.2007).  A *prima facie* case includes at least five elements:

---

[10]   Regardless of conclusory allegations, the water deprivation claim merely is a dressed-up negligence claim.

To obtain relief under § 504 of the Rehabilitation Act, a plaintiff must prove that he or she (1) is disabled under the Rehabilitation Act, (2) was "otherwise qualified" for a program or activity, (3) was excluded from the program or activity solely because of the disability … .

Harris v. Thigpen, 941 F.2d 1495, 1522 (11th Cir. 1991).

The fourth element of a *prima facie* case is that the claimant properly *requested a reasonable accommodation*. Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir.1999) ("the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."). The fifth element is damages that exceed *de minimis* harm. See Bircoll, 480 F.3d at 1088 (dismissing ADA and RA claim for failure to show damages).

Critically, respondeat superior liablity is not available under the ADA or the RA. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 285, 118 S.Ct. 1989 (1998) (rejecting respondeat superior liablity for entities under Title IX); Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 349 (11th Cir.2012) (rejecting respondeat superior liability and adopting Gebser's culpability standards for RA claim).

Last, a state entity entitled to Eleventh Amendment immunity can only be liable under the ADA where its action was "motivated by discriminatory animus or ill will based on the [decedent's] disability." Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 111 (2d Cir. 2001).  For the reasons discussed below, the complaint fails to state a viable claim under the ADA and RA.

### 1. Medical Care Cannot Ground ADA or RA Claims

The gravamen of Plaintiffs' ADA/RA complaint involves medical decisions, which categorically fall outside of the ambit of the ADA and RA. Plaintiffs' medical malpractice complaint in the state court of DeKalb County establishes that the decedent was under medical care.[11] Plaintiffs simply contend that the medical care was deficient.

Under Eleventh Circuit precedent, disability discrimination claims cannot be based on deficient medical care.[12]   That well-settled rule disposes of Plaintiffs' contention that the Decedent should have been transferred to a mental hospital, or otherwise provided with some different or additional medical treatment.

### 2. Lack of any Request for Accommodation Bars the ADA/RA Claim

A claimant under the RA and/or ADA has the burden to request an accommodation to trigger a disability claim. Otherwise the ADA and RA are strict liability statutes, and require government officials to read a claimant's mind.

> The burden of identifying an accommodation … rests with [the disabled claimant seeking an accommodation], as does the ultimate burden of

---

[11]   Exhibit 1 – Tilson, *et al*. v. Wellpath, LLC, *et al*, DeKalb State Court case No. 20A79577 (filed March 10, 2020).

[12]   "[T]he ADA is not a 'remedy for medical malpractice' and 'would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners.' " Jones v. Rutherford, 546 F. App'x 808, 811 (11th Cir. 2013) (quoting Schiavo v. Schiavo, 403 F.3d 1289, 1294 (11th Cir. 2005)); Schiavo, 403 F.3d at 1294 (holding that the Rehabilitation Act and the ADA are not intended to apply "to decisions involving the termination of life support or medical treatment"); Buchanan v. Maine, 469 F.3d 158, 174-75 (1st Cir. 2006); Burger v. Bloomberg, 418 F.3d 882 (8th Cir. 2005); Fitzgerald v. Corr. Corp. of Am., 403 F.3d 1134, 1144 (10th Cir. 2005).

persuasion with respect to showing that such accommodation is reasonable. <u>See</u> <u>Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1286 (11th Cir.1997). Furthermore, "where a plaintiff cannot demonstrate 'reasonable accommodation,' the [defendant's] lack of investigation into reasonable accommodation is unimportant." <u>Willis v. Conopco, Inc.</u>, 108 F.3d 282, 285 (11th Cir.1997). Finally, before [a defendant] has a duty to show undue hardship, the plaintiff first must show that a reasonable accommodation exists. <u>See</u> <i>id.</i> at 286.

<u>Earl v. Mervyns, Inc.</u>, 207 F.3d 1361, 1367 (11th Cir.2000).[13]

Here, there is no allegation that the Decedent requested or demanded any accommodation specifically connected to an alleged disability. Similarly, there is no allegation that the Decedent utilized the Jail's written grievance procedure, which could have placed decision makers on notice that he was demanding some accommodation based on disability. Concerning written accommodation requests under procedures made available by government agencies, the First Circuit recognized that:

> If a prison is faithful in utilizing its grievance procedure and inmates clearly recognize that compliance with that procedure is the only acceptable method for airing their complaints, it may well be that a prisoner must follow that procedure before pursuing a Title II claim.

<u>Kiman</u>, 451 F.3d at 291. As with practically all jails of any size, the Rockdale County Sheriff's Office has an inmate grievance procedure.[14] The Decedent's

---

[13]   <u>See also</u> <u>Kiman v. New Hampshire Dept. of Corrections</u>, 451 F.3d 274, 283 (1st Cir.2006) (discussing requirement for accommodation request in Title II ADA cases); <u>Bartlett v. New York State Bd. of Law Examiners</u>, 226 F.3d 69, 86 (2d Cir. 2000) ("If Bartlett's requests for accommodations did not provide enough information for the Board to determine that she was disabled, the Board would not be liable.").

[14]   There is no allegation about the jail's grievance procedure, but the Court

failure to utilize the Jail's grievance process bars Plaintiffs' ADA and RA claims.

In the ADA context, written notice of disability and request for accommodation is particularly important for institutions such as law enforcement agencies and jails. In that context, front line officers—whether designated as supervisors or otherwise—typically lack detailed medical training and are therefore not necessarily able to recognize or properly evaluate accommodation needs. Oral inmate complaints—about a host of topics—may be numerous and impracticable to communicate to supervising officials. Moreover, accommodations under the ADA and RA often require decisions by high-level supervisors, who must make decisions that likely implicate a host of other policy problems.

Supervising officials are typically the ones empowered and trained to weigh the competing policy considerations raised by detainee accommodation requests, for example: (1) does the requested accommodation pose an additional security risk; (2) does the accommodation overtax limited staff or financial resources; (3) does the accommodation generally comport with the various compelling state interests inherent in law enforcement and lawful incarceration?[15]

can judicially notice the existence of the Rockdale County Jail's inmate grievance procedure from other cases on record. See, e.g., Wood v. Edge, et al., Case 1:06-CV-420-TCB, Doc. 62 at 6, 23 (concerning Rockdale Jail grievance coordinator in claim by inmate, who "submitted several medical request forms and/or grievances concerning his dental problems.").

[15] See generally Turner v. Safley, 482 U.S. 78, 85, 107 S.Ct. 2254, 2259 (1987) (noting that "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources … ."); Bell v. Wolfish, 441 U.S. 520, 548 n.29, 99 S.Ct. 1861, 1879 n.29 (1979) (pretrial

Therefore, supervising law enforcement officials must have the benefit of a written grievance or inmate request before the institution is placed in jeopardy of liability under the ADA or RA. Detainee accommodation requests normally fit neatly within the standard written grievance and/or inmate request procedures in place at most law enforcement agencies and jails. Since there is no allegation of a requested accommodation based on disability through the Jail's grievance process or otherwise, the ADA and RA claims must be dismissed.

In sum, public entities are entitled to fair notice that an accommodation is demanded before being hauled into federal court under the ADA or RA.  Because nobody properly put the Sheriff's Office on notice that the Decedent allegedly needed or desired some form of accommodation based on disability, Plaintiffs have failed to state a claim under the ADA and RA.

### 3.  Plaintiffs Have Not Alleged Denial of Reasonable Accommodations

Plaintiffs bear the "ultimate burden of persuasion with respect to showing that … accommodation is reasonable," Earl v. Mervyns, Inc., 207 F.3d 1361, 1367 (11th Cir.2000), as well as "the burden [to] show how the accommodations offered … were not reasonable." Memmer v. Marin County Courts, 169 F.3d 630, 634 (9th Cir.1999). Here, the officers involved with the Decedent had him on suicide watch,

---

detention case, noting that "the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch.").

under a perceived threat from self-harm. Doc. 19 at ¶¶28, 33, 38.[16] Otherwise, medical professionals were charged with considering the Decedent's medical needs, including evaluating his mental health needs. Exhibit 1 – Tilson, et al. v. Wellpath, LLC, et al, DeKalb State Court case No. 20A79577 (filed March 10, 2020); Doc. 19 at ¶¶10, 28, 54, 168.

In regard to basic necessities, Plaintiffs allege that officers provided the Decedent with food. Doc. 65 at ¶151 ("Tilson did not eat the food he had been given in recent days… ."). The complaint says that the Decedent "regularly dumped water, refused water, or threw water back at jailers." Doc. 65 at 109. Plaintiffs acknowledge that Decedent's cell had a functioning sanitation system to dispose of bodily waste. Doc. 19 at ¶35; Doc. 65 at 94. Moreover, there is no fact-based allegation that it was a Sheriff's Office policy to deny water or any other necessity to any detainee, much less the Decedent.

Even taking the operative complaint's factual allegations at face value, there was no intentional "discrimination" by the Sheriff's Office solely on the basis of disability. In fact, Sheriff's Office policy prohibited discrimination against segregated prisoners like the Decedent. Jail Policy 2.6 III(C.[1]) provides that such inmates "will be afforded, circumstances and behavior permitting, the same privileges as other general housing inmates." Exhibit 2.  The complaint seems to allege in conclusory terms (without any factual details) that officers acted contrary

---

[16]   Plaintiffs' various complaint allegations can be used as admissions for purposes of this motion.

to that policy, but a policy violation(s) cannot support a claim that the *Sheriff's Office* discriminated intentionally against the decedent on the basis of some claimed disability. See Monell v. Department of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018 (1978); Luke v. Brown, 253 F. App'x 916, 918 (11th Cir. 2007) ("Although it is unfortunate that Officer Brown departed from the county's policy, that departure does not mean that the policy itself was unconstitutional or that it was the moving force behind the alleged constitutional violation.").

Under 28 C.F.R. § 35.150 (a), "A public entity shall operate each service, program, or activity so that the service, program, or activity, *when viewed in its entirety*, is readily accessible to and usable by individuals with disabilities." (emphasis supplied). Under 28 C.F.R. § 35.150 (b)(1), "A public entity may comply with the requirements of this section through … any … methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities."

By taking steps to ensure that the Decedent was protected from self-harm and under medical supervision, the Sheriff's Office reasonably accommodated any supposed disability of the Decedent, and no well-pleaded factual contention supports "deliberate indifference" by the Sheriff's Office to any obligation imposed under the ADA or RA.

Prevention of self-injury, and the Decedent's history of triggering use of force incidents (Doc. 65 at ¶¶40-41, 46, 203), necessarily required treatment that looked different from more traditional inmates. However, federal courts have ruled that all

of the suicide watch procedures and conditions that the Plaintiffs complain about (excluding accumulated refuse, which did not cause harm) are appropriate and even required for detainees at risk for suicide. "The defendant's interest in protecting the prisoner against taking his own life is well reflected by cases finding jailers whose prisoners have committed suicide liable when their negligence allows prisoners who they knew were suicidal to commit suicide." <u>McMahon v. Beard</u>, 583 F.2d 172, 175 (5th Cir. 1978) (finding no constitutional violation where suicidal inmate held for 90 days alone in cell without clothing, etc.).

Therefore, Plaintiffs cannot show that the Sheriff's Office discriminated against the Decedent solely due to his previously undisclosed, alleged disability.

**4.    Plaintiffs Cannot Show that Sheriff's Office Policy Intentionally Caused Denial of a Benefit or Service Based on Mental Illness**

Initially, Plaintiffs' ADA and RA claim fails because the Decedent was not a "qualified individual" for any relevant service or program of the Sheriff's Office,[17] and he was not denied participation in "services, programs, or activities" of the Sheriff's Office on the basis of his unspecified mental illness. <u>See</u> 42 U.S.C. § 12132. Rather, the Decedent was a pretrial detainee under arrest for criminal offenses. While the ADA has been applied to some jail services, the better-reasoned authorities hold that criminal processes and incarceration are not

---

[17]    Under 42 U.S.C. § 12131(2), a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications ... or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."

appropriately viewed as "services, programs or activities" as contemplated by the ADA and RA.[18]

The Decedent was arrested and later held in a special cell under suicide watch, based on a perceived suicide risk. If there was a "service, program or activity" of the Sheriff's Office involved here, it was incarceration with a reduced risk of self-harm and basic necessities. The Decedent got that, though it appears he did not drink most of the fluids provided to him.

The Decedent's conditions of confinement do not support an ADA/RA claim. As noted above, Jail Policy 2.6 III(C.[1]) required that segregated inmates "will be afforded, circumstances and behavior permitting, the same privileges as other general housing inmates." Exhibit 2.  Since there is no case to be made that a Sheriff's Office policy caused intentional denial of access to "services, programs or activities" solely based on mental illness, the complaint fails to state a valid claim under the ADA and RA. See Barber v. Colo. Dep't of Revenue, 562 F.3d 1222, 1228 (10th Cir. 2009) ("[t]o recover compensatory damages under § 504, a plaintiff must establish that the [relevant] discrimination was intentional.").

### 5.  Plaintiffs Do Not Allege Intentional Discrimination by a Policymaker

To the extent that Plaintiffs seek recovery under the ADA or the RA based on intentional discrimination, their claim fails for (1) lack of well-pleaded facts

---

[18] See Rosen v. Montgomery County, 121 F.3d 154 (4th Cir.1997) (finding that arrest was not a "program, benefit or service" for ADA purposes); Torcasio v. Murray, 57 F.3d 1340, 1347 (4th Cir.1995) ("The terms 'eligible' and 'participate' imply voluntariness on the part of an applicant who seeks a benefit …; they do not bring to mind prisoners who are being held against their will.").

that support intentional discrimination and (2) lack of any allegation of intentional discrimination that can be imputed to the Sheriff's Office.

As for the first point, an officer with general knowledge that an inmate is mentally ill does not thereby know how to comply with a disability statute. And lack of compliance under that circumstance is not "intentional discrimination." The case of Gray v. Cummings, 917 F.3d 1 (1st Cir. 2019), is instructive in this respect.

> [I]t is undisputed that [Officer] Cummings knew that Gray was a section 12 patient and, thus, had a disability (specifically, that she suffered from an unspecified mental illness). But … Cummings had [no] particularized knowledge about the nature or degree of Gray's disability. [T]he fact that Gray was a section 12 patient served only to put Cummings on notice that she had been deemed a danger to herself or to others. There is insufficient evidence to suggest that Cummings knew either that Gray suffered from bipolar disorder or that she was experiencing a manic episode. Without such particularized knowledge, Cummings had no way of gauging whether the conduct that appeared unlawful to him was likely to be a manifestation of the symptoms of Gray's mental illness. So, too, without such particularized knowledge, Cummings had no way of gauging what specific accommodation, if any, might have been reasonable under the circumstances.

Gray, 917 F.3d at 18.

As in Gray, here no officer had information about the Decedent's specific psychiatric condition, and no officer had the type of specialized knowledge that would provide some insight into how any special (unrequested) accommodation was supposed to look. It follows that the officers who dealt with the Decedent lacked sufficient information to form the predicate for statutory disability discrimination.

Next, Plaintiffs appear to assert (in purely conclusory terms that are not

entitled to any credit) that individual supervisors discriminated against the Decedent due to his behavior, which allegedly was a manifestation of mental illness. Courts have rejected that type of "effects of disability" theory. See Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 933 (7th Cir. 1995) (dismissing disability claim where employer did not know about disability, and firing was based on effects of disability).[19]

Aside form that point, none of the jail officers were policymakers for the Sheriff's Office.

> [S]tate law determines whether a particular official has final policymaking authority. Praprotnik, 485 U.S. at 123, 108 S.Ct. at 924. … State law always should direct us "to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." Id. at 125, 108 S.Ct. at 925. We may not assume that final policymaking authority lies in some entity other than that in which state law places it. Id. at 126, 108 S.Ct. at 925. To the contrary, we must respect state and local law's allocation of policymaking authority.

McMillian v. Johnson, 88 F.3d 1573, 1577 (11th Cir. 1996), aff'd sub nom. McMillian v. Monroe Cty., Ala., 520 U.S. 781, 117 S. Ct. 1734 (1997).

Georgia law is crystal clear that final policymaking for the Sheriff's Office is vested in the Sheriff, subject to supervision by the Governor. Manders , 338 F.3d

---

[19]    Hedberg's "effects of disability" discussion is worth noting here for its cogent reasoning. "The ADA hardly requires that merely because some perceived [conduct] is rooted in disability, an employer who has not been informed of the disability, and who has no reason to know of the disability, is bound to retain all apparently [misbehaving] employees on the chance that they may have a disability that causes their behavior. The ADA does not require clairvoyance." Hedberg, 47 F.3d at 934.

at 1319–20.  Therefore, Plaintiffs bear the burden to show that *the Sheriff's Office* intentionally discriminated through *official policy*, not merely that an *individual* officer intentionally discriminated. See Badillo v. Thorpe, 158 Fed.Appx. 208, 214 (11th Cir.2005) ("In order to recover compensatory damages under the RA [or ADA], a plaintiff must demonstrate 'intentional discrimination or bad faith.' "); Gray v. Cummings, 917 F.3d at 17 ("a plaintiff must show "intentional discrimination" on the part of the public entity to be eligible for damages on a Title II claim[.]"); Memmer v. Marin County Courts, 169 F.3d 630, 634 (9th Cir.1999) ("monetary damages are not warranted in cases of *unintentional* discrimination … [and] failure to produce evidence of discriminatory intent on the part of [the entity defendant] is fatal" to an ADA claim).

Here, no facts pleaded in the complaint support "intentional discrimination or bad faith" pursuant to a Sheriff's Office policy sufficient to ground a claim under the ADA/RA. Put differently, there is no allegation that Sheriff's Office policy caused the Decedent to be subjected to intentional discrimination solely based on an identified mental illness. Therefore, Plaintiffs' ADA/RA claim against Sheriff Levett must be dismissed.

## CONCLUSION

For each of the foregoing reasons, Sheriff Levett is entitled to dismissal of all claims against him, personally and in his official capacity.  Defendant requests the Court to certify any dismissal as final under Rule 54(b).

Respectfully submitted,

WILLIAMS, MORRIS & WAYMIRE, LLC

/s/ *Jason Waymire*
JASON C. WAYMIRE
Georgia Bar No. 742602
Attorneys for Defendant Sheriff Levett

Bldg. 400, Suite A
4330 South Lee Street
Buford, GA 30518
T: 678-541-0790
F: 678-541-0789
jason@wmwlaw.com

## CERTIFICATION OF COMPLIANCE WITH L.R. 5.1(B).

Counsel for Defendants certifies that the foregoing Brief complies with the font and point size requirements of Local Rule 5.1(B).